# In the United States Court of Federal Claims

No. 15-1589
(Filed: September 30, 2016)

```
*************************************
PROXTRONICS DOSIMETRY, LLC,          *
                                     *
              Plaintiff,             *    Bid Protest; Motion to Dismiss; RCFC
                                     *    12(b)(1); RCFC 12(b)(6); Lanham Act;
v.                                   *    Federal Question; Diversity; Intellectual
                                     *    Property; Standing; Waiver; Mootness;
THE UNITED STATES,                   *    Jurisdictional Discovery
                                     *
              Defendant.             *
*************************************
```

Randy McRae, Largo, MD, for plaintiff.

Meen Geu Oh, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court are defendant's motion to dismiss plaintiff's third amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") and plaintiff's motion to conduct jurisdictional discovery.  In the underlying bid protest, plaintiff Proxtronics Dosimetry, LLC ("Proxtronics") challenges two separate contract awards by the United States Air Force ("Air Force") to Radiation Detection Company ("RDC") for the acquisition of Thermoluminescent Dosimeter ("TLD") badges by Wright-Patterson Air Force Base ("AFB") in Ohio.  For the reasons set forth below, the court grants defendant's motion to dismiss and denies plaintiff's motion to conduct jurisdictional discovery.

## I. BACKGROUND

### A. Plaintiff and Its Sale of Panasonic-Brand TLD Badges

Plaintiff was established in 1990 as a supplier of radiation monitoring products and services, including TLD badges.[1]  3rd Am. Compl. ¶¶ 10-11, 16.  A TLD badge, which measures

---

[1]  A motion to dismiss tests the sufficiency of a complaint.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007).  Accordingly, when ruling on a motion to dismiss, "the court may consider . . . the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the judge may take judicial notice."  2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.34[2] (3d ed. 2012).  Consequently, in

radiation levels, is an important safety tool utilized by the Air Force to protect its personnel from unsafe levels of radiation.  Pl.'s Ex. L.  More generally, the Air Force:

> monitors, records, and reports radiation levels of medical and other personnel routinely exposed to radiation in the performance of their duties or individuals entering high radiation areas.  TLDs are used to record the medical legal dose of record of personnel working in the labs as required by [law].  Phased replacement of the TLD[s] is an established recurring program requirement.

Id. at 11.[2]

By 2004, plaintiff was "the fourth largest personal radiation monitoring services entity in the United States."  3rd Am. Compl. ¶ 11.  Eventually, plaintiff "established itself as an international supplier of dosimetry needs in Switzerland, Mexico, Costa Rica, and Brazil wherein it[] market[ed], distribute[d], and s[old] a wide range of environmental, industrial, medical and security dosimetry applications."  Id.

Plaintiff has provided TLD badges and services to the Air Force under prior contracts.  Id. ¶ 15.  Specifically, plaintiff is an "incumbent for these very services under an [indefinite delivery indefinite quantity ("IDIQ")] contract with the Air Force Institute for Environment, Safety and Occupational Risk Analysis . . . at Brooks AFB."  Id.  In addition, plaintiff has "worked with the Air Force Center for Radiation Dosimetry and maintained the U.S. Air Force Master Radiation Exposure Registry."  Id.

Plaintiff has a history of purchasing TLD badges and other dosimetry products directly from Panasonic Industrial Devices Sales Company of America ("Panasonic").  Id. ¶ 16.  For example, on June 12, 2013, Panasonic responded by electronic-mail message to a purchase

---

resolving defendant's motion to dismiss, the court evaluates plaintiff's third amended complaint and the attached exhibits.  However, those documents omit certain facts regarding how and why the two procurements at issue in this case were conducted.  As a result, to provide a complete understanding of the facts surrounding those procurements, the court also considers a document attached to defendant's motion to dismiss—the declaration of Christopher A. Hasen, who is the Section Chief for Technology Support, Operational Contracting at Wright-Patterson AFB, and was either the contracting officer or the contracting officer's supervisor for the procurements at issue.  Plaintiff did not object to defendant's submission of the declaration or dispute any of the facts set forth by Mr. Hasen.

[2]  Several of the exhibits attached to plaintiff's third amended complaint and referenced in its response to defendant's motion to dismiss contain multiple documents that are not separately paginated, and are nonsequentially numbered.  For clarity, the court references the page numbers assigned by its electronic case filing system when citing to or quoting from a specific exhibit.

inquiry from plaintiff advising that it would "be delighted to extend to Proxtronics an offer on the TLD equipment as soon as [it] receive[d] the Bill of Material," and that "[t]he offer [would] be limited to the supply of the product, but exclude[] installation and/or training." Pl.'s Ex. C. Although the initial price quotation excluded installation and training, Panasonic further advised that it would train plaintiff's team regarding the proper installation of TLD equipment. Id. On August 28, 2013, Panasonic provided plaintiff with a quotation offering to sell its TLD badges for $22 per unit. 3rd Am. Compl. ¶ 18; Pl.'s Ex. D.

## B. Panasonic Changes Its "Go to Market Strategy"

As part of its plan to expand its international business operations, plaintiff contacted Panasonic on October 10, 2013, requesting a quotation for dosimetry equipment to be provided to the government of Mexico. 3rd Am. Compl. ¶ 19; Pl.'s Ex. E. In response to plaintiff's request, RDC, not Panasonic, sent plaintiff a quotation offering to sell Panasonic-brand TLD badges for $35 per unit. 3rd Am. Compl. ¶ 19; Pl.'s Ex. E at 28-29. RDC is plaintiff's direct competitor. 3rd Am. Compl. ¶ 19. Realizing that it would no longer be able to purchase TLD badges at $22 per unit directly from Panasonic, but would instead be required to purchase the devices through RDC, thus incurring RDC's $11 per unit mark-up charge, plaintiff complained to Panasonic that "RDC's involvement was unlawful, unfair, and anticompetitive." Id.; see also Pl.'s Ex. E at 23 ("Requiring us to purchase products through a competitor ([RDC]) has effectively put us at a price disadvantage, both domestically and internationally."). Panasonic's representative, Sam Estanbouti, reiterated the company's change in marketing strategy to Proxtronics by electronic-mail message dated October 29, 2013: "I have already informed you last time you called that Panasonic cannot engage in price discussion on behalf of a 3rd party. Your quote was initiated by RDC; therefore, your special pricing request will have to be addressed directly with RDC." Pl.'s Ex. E at 30.

Two months later, by letter dated January 1, 2014, Sam Piccarreta, Panasonic's Vice President for Sales and New Business Development, explained to plaintiff that Panasonic had "changed its go to market strategy for its [TLD] product line and service network" and would "route most current and future customers through RDC." Pl.'s Ex. F. He further explained that RDC would "be a Panasonic dealer for TLD badges [and would] be responsible for sales and support of existing Panasonic systems in the field." Id. Then, in a letter dated January 2, 2014, Mr. Piccarreta reconfirmed his previous day's advice:

> I was recently advised that you had contacted Mr. Joseph Taylor, the Chairman and Chief Executive Officer of Panasonic Corporation of North America, regarding the possible direct purchase of Panasonic [TLD] products and services . . . . I am also aware that you have been communicating with a manager in my group, Sam[] Estanbouli, regarding the possible direct purchase of these products and services . . . .

> Recently, [Panasonic] decided to stop making direct sales of Panasonic TLD products and services to resellers and customers. Such sales are now being

directed to [RDC].  If [Proxtronics] would like to purchase Panasonic TLD products and services, [it] must do so through RDC.  The purchase price for such products and services [is] determined solely by RDC.

Pl.'s Ex. G.

Contemporaneous with its advice to plaintiff regarding its new sales distribution model, Panasonic informed the Air Force by letter dated January 1, 2014, that it would no longer sell its TLD product line directly to customers, such as the Air Force.  Hasen Decl. ¶ 6.  Panasonic provided the Air Force with the identical explanation it gave to plaintiff—that going forward it would sell its TLD product line only through RDC, its authorized dealer.  Id.; accord 3rd Am. Compl. ¶¶ 20-21; Pl.'s Ex. G.

## C.  The Air Force's Fiscal Year 2014 Procurement of TLD Badges

The Air Force conducts an annual procurement of TLD badges.  Hasen Decl. ¶ 4. Specifically:

> One of the important acquisitions that our section conducts . . . on an annual basis is for . . . [TLD] badges.  Each year a contract is awarded for a quantity of 10,000 Panasonic . . . TLD badges, which are provided to Air Force employees worldwide who in the conduct of their job duties are exposed to various levels of radiation.  The badges are then inserted into badge readers which measure the level of radiation to ensure that the employee is not experiencing harmful levels.  . . . [A] quantity of 10,000 badges is bought each year as replacements due to the fact that the badges have a shelf life of seven (7) years. Prior to FY2014, the Air Force contracted on a sole source basis directly with Panasonic as the manufacturer of the badges.  However, as of 1 Jan[uary] 2014, Panasonic decided to stop selling directly to its customers and instead sell its products through an authorized distributor, [RDC].

Id.

In light of Panasonic's January 1, 2014 advice to the Air Force that it could no longer acquire TLD badges directly from Panasonic, the Air Force, in anticipation of its fiscal year 2014 procurement ("2014 procurement") of TLD badges, conducted market research to identify manufacturers of TLD badges and equipment.  Id. ¶ 6.  Through its research, the Air Force identified three potential sources:  Panasonic, Landauer, and Thermo Fisher Scientific.  Id. However, of the products offered by these three manufacturers, only the TLD badges manufactured by Panasonic met all of the Air Force's requirements.  Id.  Notwithstanding this information and the advice from Panasonic concerning its new sales distribution model, the Air Force chose to conduct a second round of market research to determine if there were other potential sources for Panasonic-brand TLD badges.  Id.  Accordingly, on June 24, 2014, the Air

Force posted a sources sought synopsis ("SSS")[3] to the Federal Business Opportunities ("FedBizOpps" or "FBO") website.[4]  Id.  The SSS specifically indicated that it was not a solicitation; rather, it was published for market research purposes only.  See Renerative Tissue - FA8601-14-R-0057 (Archived), http://www.fbo.gov (last visited Sept. 21, 2016).  The SSS also indicated that the results of the market research would be used to determine whether the Air Force would conduct a competitive procurement.  Id.  Further, the SSS provided that the procurement had been assigned North American Industrial Classification System ("NAICS") code 334517.  Id.

Responses to the SSS were due by July 9, 2014.  Id.  However, the Air Force did not receive any responses by that deadline.  3rd Am. Compl. ¶ 23; Pl.'s Ex. H at 36.  On August 15, 2014, the Air Force posted a revised SSS to the FedBizOpps website with a five-day response period.[5]  3rd Am. Compl. ¶ 25.  The Air Force received only one response to its revised SSS— from RDC.  Pl.'s Ex. L at 12.

Having received only one response to the revised SSS, the Air Force contracting officer obtained formal management approval of a Justification and Approval document ("J&A") recommending a sole-source acquisition of Panasonic-brand TLD badges from RDC.  Pl.'s Ex. H at 36-37; Pl.'s Ex. L.  The J&A indicated that "[p]er [a] telephone conversation with RDC salesman William Laing, RDC [would] honor the [General Services Administration] contract unit price of $19.00."  Pl.'s Ex. L at 12.

On September 12, 2014, the Air Force posted to the FedBizOpps website a notice of intent ("NOI") to award a sole-source contract for TLD badges to RDC under solicitation number FA8601-14-R-0057.  3rd Am. Compl. ¶ 26; Pl.'s Ex. I.  The Air Force received no response to its NOI within the three-day period allotted in the notice.  Pl.'s Ex. H at 37.  On September 16, 2014, the Air Force both sent the solicitation to RDC and received RDC's proposal.  Hasen Decl. ¶ 7.  On September 19, 2014, the Air Force awarded a $190,000 contract to RDC under contract number FA8601-14-P-031, Pl.'s Ex. I, having deemed the proposal to be technically acceptable and the price to be fair and reasonable, Hasen Decl. ¶ 7.  That same day,

---

[3]  An SSS notifies the public of proposed government contract actions, and one of its "primary purposes" is to "enhance competition by identifying contracting . . . opportunities."  48 C.F.R. § 5.201(c) (2013).  In addition, an SSS advises the public that "all responsible sources may submit a capability statement, proposal, or quotation, which shall be considered by the agency."  Id. § 5.207(c)(16).

[4]  The court takes judicial notice of the SSS, which was posted on the FedBizOpps website, pursuant to Rule 201(b)(2) of the Federal Rules of Evidence.  For convenience, the court includes a copy of the SSS as an attachment to this decision.

[5]  The Air Force reposted the SSS "because the original posting had the wrong title."  Pl.'s Ex. L at 12.

the Air Force posted a synopsis of award to the FedBizOpps website.  Id.  Pursuant to the terms of the contract, RDC delivered the TLD badges to the Air Force on July 7, 2015, and the Air Force paid RDC's invoice for those badges on August 17, 2015.  Hasen Decl. ¶ 7.

Approximately one month after the Air Force posted the NOI to award a sole-source contract, plaintiff sent a letter dated October 10, 2014, to the Small Business Administration ("SBA") objecting to the Air Force's contract award to RDC.  3rd Am. Compl. ¶ 29; Pl.'s Ex. J. In its letter, plaintiff stated:

> The purpose of this letter is to protest the sole-source award to RDC [in accordance with] FA8601-14-4-0057 . . . for 10,000 Panasonic manufactured TLDs.  This sole-source for the purchase [of] Panasonic manufactured TLDs awarded to RDC[] inhibits free and fair competition, which adversely affect[s] small/disadvantaged businesses, and the government.
>
> . . . .
>
> In the [SSS] published, the reason cited for lack of competition . . . was [that] RDC "is the only known source for . . ." . . . Panasonic TLDs and their readers.  In the [J&A], . . . the same reason was cited with RDC being "the only firm capable of providing the supplies".  Therefore, purchase [from] another manufacturer of TLDs would not be compatible with the Panasonic system, thus resulting in a substantial cost increase for the Government.
>
> First, I disagree with the statement that RDC "is the only known source for this system."  This statement is definitely false.  [Proxtronics] has been selling Panasonic TLD[s] for over 15 years.  Panasonic is the sole manufacturer of these TLD[s] and has an exclusive contract with RDC (within recent years) for distribut[ion] of their radiation detection related products globally (except for EU and Japan).  But that does not translate to RDC as being the only known source for this system.  This agreement between Panasonic and RDC dictates a monopoly for these Panasonic TLDs.
>
> Second, I challenge the merits of such "exclusive contracts" which result in one company (i.e. RDC) having control of the supply distribution (i.e. Panasonic TLDs and related systems), especially in such a specialized field.
>
> Third, we are questioning if the size standard requirement for this award was met by RDC.
>
> In conclusion, I am requesting that the SBA give some consideration to reviewing the merits of this award[.]

-6-

Pl.'s Ex. J at 2-3.  Plaintiff sent copies of this letter to United States Senators Mark R. Warner and Timothy M. Kaine and Wright-Patterson AFB contracting specialist Blaine M. Greenwalt. Id. at 3.  Senator Warner subsequently wrote to the SBA on plaintiff's behalf to make inquiries concerning the Air Force's procurement of TLD badges from RDC.  See Pl.'s Ex. H.

By letter dated October 23, 2014, the SBA responded to Senator Warner acknowledging receipt of, and the bases for, plaintiff's protest.  Pl.'s Ex. H at 36-38.  It explained that plaintiff's protest concerned whether the sole-source award to RDC was proper, whether the Air Force adhered to federal regulations, and whether there was a size standard requirement for the procurement and, if so, whether RDC qualified as a small business.  Id. at 36.  It then provided Senator Warner with a summary of its "findings":

> On June 24, 2014, the Air Force posted a[n SSS] to the [FBO] requesting responses within 15 calendar days; at the end of the 15 day period no responses had been received.  The Contracting Officer assigned [NAICS] Code 334517 to this acquisition which was included in the SSS.

> On August 15, 2014, the Air Force posted a revised SSS to FBO with a response time of 5 calendar days.  As a result of this second posting, one response was received from . . . RDC . . . .  No response was received from . . . Proxtronics . . . , or any other small business firms.  Under Federal regulations . . . , the Air Force was not required to set the procurement aside for small business because the FBO postings did not show that two or more small businesses existed which had the competence and capacity to satisfy the requirement at a fair market price. The Air Force had received only one response to both the initial and revised SSS.

> . . . .

> The Air Force's formal [J&A] recommended a sole source award to RDC . . . because[] Panasonic was the only known manufacturer of TLD badges that met the requirements.  The requirements package from . . . Wright-Patterson AFB, Ohio, identified three potential manufacturers:  Panasonic, Thermo Fisher Scientific, and Landauer.  However, only the Panasonic system met all of the Air Force's requirements.  In fact, the Air Force had previously awarded multiple acquisitions on a non-competitive basis to Panasonic.  On September 12, 2014, the Air Force posted a[n NOI] to award sole source on FBO with a response time of 3 days.  Yet again, no responses were received, including any response from . . . Proxtronics . . . .  The SSS and [NOI] contained the same [NAICS] code, which had been used on previous acquisitions.

Id. at 36-37.  The SBA then confirmed that the contracting officer's conduct was, at all times, in accordance with procurement laws:

> After [the] conclusion of market research, including the two SSSs, the Contracting Officer concluded that . . . RDC . . . was the only known distributor of Panasonic TLD badges.  This fact has since been validated by Panasonic on October 20, 2014.  . . . Proxtronics . . . failed to respond to either the SSS or [NOI] to Award to RDC . . . , all of which were posted on FBO.
>
> Based on the information available and the circumstances surrounding this procurement, the Contracting Officer made a reasonable determination.  If . . . Proxtronics . . . or other companies become authorized distributors of Panasonic TLD products, the Air Force has agreed to conduct full and open competition procedures on future acquisitions.
>
> The Air Force has no influence or authority concerning the private contractual agreement between . . . Panasonic . . . and RDC . . . relative to selling TLD badges.  The only avenue available to Proxtronics . . . or any other potential supplier would be to challenge this issue through litigation or approach Panasonic about becoming a distributor of TLD products.
>
> Based on the market research findings, there was no basis for the Air Force to set this acquisition aside for small business.  Therefore, whether [RDC] met the size standard of 500 employees was not a factor in making the award.

Id. at 37-38.

Plaintiff did not furnish the Air Force with a copy of the protest it filed with the SBA. Hasen Decl. ¶ 8.  Rather, the Air Force learned of plaintiff's communication with the SBA on October 16, 2014, when the Air Force was notified that plaintiff had requested a congressional inquiry regarding the Air Force's sole-source contract award to RDC.  Id.  There were no further communications between the Air Force and plaintiff regarding the contract award during 2014. Id.

In addition to its SBA protest, on November 3, 2014, plaintiff sent a letter to the Federal Trade Commission ("FTC") advising the FTC of a "suspected violation" of antitrust laws by Panasonic and RDC.  Pl.'s Ex. K at 5.  Plaintiff contended in its letter that the distribution agreement between Panasonic and RDC was anticompetitive because it placed entities such as plaintiff "at a competitive disadvantage" and "allow[ed] RDC to control the supply and price [of TLD equipment]."  Id.  Neither the SBA nor the FTC replied to plaintiff; plaintiff's only response came from Senator Warner, who provided plaintiff with a copy of the SBA's response to his inquiry on plaintiff's behalf.  3rd Am. Compl. ¶ 31.

### D.  The Air Force's Fiscal Year 2015 Procurement of TLD Badges

When the time came for the Air Force to acquire TLD badges for fiscal year 2015 ("2015 procurement"), it again conducted initial market research to identify potential TLD badge

manufacturers.  Hasen Decl. ¶ 10.  The market research results were unchanged from the fiscal year 2014 procurement; the same three manufacturers—Panasonic, Landauer, and Thermo Fisher Scientific—were identified.  Id.  And, just as the Air Force had determined for its 2014 procurement, Panasonic was the only company whose product met all of the Air Force's requirements.  Id.  In addition, the Air Force identified RDC as the authorized distributor of Panasonic TLD badges, and determined that RDC was capable of meeting the Air Force's requirements because it had been awarded the fiscal year 2014 contract that contained the identical requirements.  Id.  The contracting officer took the additional step of contacting Panasonic to inquire as to whether, at that time, RDC remained its only authorized dealer.  Id.  On July 14, 2015, Panasonic confirmed the accuracy of the contracting officer's understanding by electronic-mail message.  Id.

Nonetheless, to research the potential for competition, on July 20, 2015, the Air Force posted to the FedBizOpps website a sources sought notice ("SSN") for solicitation number FA8601-15-R-0124 to acquire 10,000 TLD badges to satisfy its fiscal year 2015 requirement. Pl.'s Ex. M at 16-19.  The SSN provided a response deadline of August 3, 2015.  Id. at 16; 3rd Am. Compl. ¶ 34.  The SSN also indicated that it was "issued solely for information and planning purposes" and did "not constitute a Request for Proposal . . . ."  Pl.'s Ex. M at 16.

On July 31, 2015, plaintiff, a recognized small and disadvantaged business located in a HUBZone, submitted its response to the SSN.  3rd Am. Compl. ¶ 38; Pl.'s Ex. N.  On August 7, 2015, the Air Force informed plaintiff by electronic-mail message that it could not be considered for the contract based upon Panasonic's advice that RDC was the only authorized reseller of Panasonic-brand TLD badges.  Pl.'s Ex. O.  The Air Force further indicated that plaintiff was "welcome to complete the process to become an authorized reseller [for Panasonic] but until then [it could not] be considered for the current acquisition of Panasonic TLD Badges."  Id.

In response to the Air Force's advice that it could not submit a bid, plaintiff filed a protest with the United States Government Accountability Office ("GAO") on August 12, 2015.  3rd Am. Compl. ¶ 40; Pl.'s Ex. P.  The Air Force's contracting officer learned of plaintiff's protest the following day.  Hasen Decl. ¶ 11.  By letter dated August 14, 2015, the Air Force responded to plaintiff's protest, asserting that the protest was premature because it was filed prior to the Air Force issuing a solicitation.  3rd Am. Compl. ¶ 41; Pl.'s Ex. Q at 28-29.

Its legal stance before the GAO notwithstanding, the Air Force investigated plaintiff's assertion that it could meet the Air Force's requirements.  Hasen Decl. ¶ 11.  On August 18, 2015, based upon plaintiff's representation that it could obtain TLD badges from XDos GmbH ("XDos"), a European partner that could purchase TLD badges directly from Panasonic, the contracting officer asked plaintiff to provide written evidence of its business relationship with XDos and proof that plaintiff could purchase the TLD badges from XDos.  Id.  Plaintiff provided its written response to the Air Force on August 24, 2015, and the Air Force determined that plaintiff had adequately demonstrated its business relationship with XDos.  Id.  Plaintiff also supplied the Air Force with multiple invoices proving that plaintiff had procured Panasonic-brand TLD badges from XDos in the past.  Id.  Based on that information, the contracting officer

-9-

"reversed the prior acquisition strategy and made a determination that Proxtronics, Inc., could meet the Air Force's requirements and that a competitive acquisition should therefore be pursued." Id.

As a result of the Air Force's decision to initiate a competitive procurement, plaintiff withdrew its GAO protest on August 26, 2015. Id. ¶ 12. On September 2, 2015, the Air Force issued solicitation number FA8601-15-R-0124 for Panasonic-brand TLD badges. Id. The solicitation reflected that the procurement was not set aside for a small business, and provided a deadline of September 10, 2015, for the submission of proposals. [6] See Panasonic TLD Badges or Equal - FA8601-15-R-0124 (Archived), http://www.fbo.gov (last visited Sept. 21, 2016). The Air Force received two timely proposals in response to its solicitation—one from plaintiff, and the other from RDC. Pl.'s Ex. S at 35. The Air Force found that both proposals were technically acceptable.[7] Id. It also found that both offerors were small businesses. Hasen Decl. ¶ 12. The Air Force then determined, after ascertaining the total evaluated price for each proposal, that RDC proposed a lower unit price than plaintiff. Pl.'s Ex. S at 35. Thus, in accordance with the terms of the solicitation, the contracting officer selected RDC for award. Id. Ultimately, the Air Force awarded RDC contract number FA8601-15-C-0104 on September 16, 2015, in the amount of $190,000.[8] Pl.'s Ex. T at 38.

On September 17, 2015, the Air Force posted the notice of award on the FedBizOpps website and informed plaintiff that it had not been awarded the contract. 3rd Am. Compl. ¶ 42; Pl.'s Ex. R. Plaintiff requested a debriefing. 3rd Am. Compl. ¶ 42; Pl.'s Ex. S. The Air Force's contracting officer provided a written debriefing by electronic-mail message on September 21, 2015:

> (1) Proxtronics['s] proposal . . . contained no significant weaknesses or deficiencies. Proxtronics['s] proposal was considered technically acceptable.

---

[6] The court takes judicial notice of the solicitation, which was posted on the FedBizOpps website, pursuant to Rule 201(b)(2) of the Federal Rules of Evidence. For convenience, the court includes a copy of the solicitation as an attachment to this decision.

[7] Notwithstanding the contents of one of the exhibits attached to the third amended complaint, see Pl.'s Ex. S at 35, plaintiff's counsel represented during status conferences with the court that the Air Force deemed plaintiff's proposal to be technically unacceptable. In its motion to dismiss, defendant asserted that plaintiff made this same allegation in its complaint and contested its accuracy. As reflected in the parties' subsequent briefs, this dispute no longer exists. See Reply 1 n.1 ("Contrary to our reading of the complaint, we note that Proxtronics has clarified that it is not alleging that it was found technically unacceptable during the Air Force's evaluation of its proposal.").

[8] The TLD badges were to be delivered to the Air Force by September 16, 2016, approximately twelve months after award. Pl.'s Ex. T at 38. On September 21, 2016, defendant filed a notice with the court indicating that RDC had fully performed the contract.

(2)  The successful vendor who was awarded a contract for this project was [RDC] . . . .  RDC's proposal . . . was considered technically acceptable. . . . RDC's total evaluated price was $190,000 ($19.00 each for 10,000 units). . . . Proxtronics['s] total evaluated price was $220,000 ($22.00 each for 10,000[ units)] without a trade-in, and proposed multiple trade-in alternatives of $21.78 per unit ($217,800 total), $20.90 per unit ($209,000 total), or $19.80 per unit ($198,000 total) depending on the number of badges traded in.  Past performance was not a factor considered in this acquisition and was not evaluated.

. . . .

(4)  . . .

. . . .


Both RDC's and Proxtronics'[s] proposals conformed to the requirements of the synopsis/solicitation and received a rating of "acceptable" on the technical capability factor.  However, RDC's proposal contained the lowest Total Evaluated Price (TEP) at $190,000, as compared to Proxtronic[s's] Total Evaluated Price (TEP) of $220,000 without a trade-in, or $217,800, $209,000, or $198,000 with badge trade-in.  Neither proposal's Total Evaluated Price was considered unbalanced.  Therefore, RDC was selected as the successful offeror and awarded the contract for this acquisition.  The price is considered fair and reasonable . . . since there [were] competitive offers submitted in response to the solicitation.

Pl.'s Ex. S at 35.

## E.  Procedural History

On December 30, 2015, plaintiff filed its complaint in this court protesting the Air Force's 2014 and 2015 TLD badge contract awards.  Subsequently, on January 4, 2016, plaintiff filed an amended complaint.  Three days later, the court held a status conference, during which plaintiff made an oral motion to file a second amended complaint due to factual inaccuracies. The court's oral ruling granting plaintiff's motion was memorialized by written order entered on the docket that same day.  Then, on February 25, 2016, the court conducted a second status conference to discuss continuing factual errors in the second amended complaint; once again, plaintiff orally moved for leave to amend its complaint.  The court orally granted plaintiff's motion.  Upon the conclusion of the status conference, the court memorialized its oral ruling in a written order.  Plaintiff thereafter filed its third amended complaint.

In its third amended complaint, plaintiff asserts jurisdiction in this court under 28 U.S.C. § 1491(b)(1); section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (2012); and federal question,

diversity, and intellectual property statutes (28 U.S.C. §§ 1331, 1332(a)(1), 1338(a)-(b) (2012)).[9]
3rd Am. Compl. ¶ 5.  Generally, plaintiff alleges that during the 2014 procurement, the Air Force
improperly awarded a contract on a sole-source basis.  Id. ¶¶ 26-28, 31-32.  Plaintiff further
alleges, with respect to the 2015 procurement, that the Air Force failed to set aside the contract
for a small business and failed to conduct a size determination.  Id. ¶¶ 36-37, 40, 45.  In its first
cause of action— "Unfair Competition"—plaintiff contends that by allowing Panasonic to
designate RDC as its distributor, the Air Force permitted unfair competition in violation of
antitrust laws, thereby rendering the contract awards to RDC improper.  Id. ¶¶ 47-50.  In its
second cause of action, which concerns both procurements, plaintiff contends that the Air
Force's conduct was arbitrary and capricious.  Id. ¶ 55.  Plaintiff further contends that the Air
Force violated 10 U.S.C. § 2304(e), which requires agencies "using procedures other than
competitive procedures to . . . request offers from as many potential sources as is practicable
under the circumstances"; 41 U.S.C. § 253(c), which describes when an agency may use
noncompetitive procedures;[10] and the following sections of the Federal Acquisition Regulation
("FAR"):  FAR 3.301-.303 regarding agency reporting of suspected antitrust violations, and FAR

---

[9]  In addition, plaintiff claims that "[t]he Court has supplemental jurisdiction over the
state law claims under 28 U.S.C. § 1367(a)."  3rd Am. Compl. ¶ 5.  However, 28 U.S.C.
§ 1367(a) applies only to district courts:

> [I]n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that they form part
> of the same case or controversy under Article III of the United States
> Constitution.

The United States Court of Federal Claims ("Court of Federal Claims") is not a district court.
Ledford v. United States, 297 F.3d 1378, 1382 (Fed. Cir. 2002) (per curiam); accord Waltner v.
United States, 98 Fed. Cl. 737, 765 (2011) (noting that 28 U.S.C. § 1367 does not authorize the
Court of Federal Claims to exercise supplemental jurisdiction), aff'd on other grounds, 679 F.3d
1329 (Fed. Cir. 2012).  Moreover, plaintiff does not allege any state law claims in its third
amended complaint, see 3rd Am. Compl. ¶¶ 47-50 (setting forth, in its "Unfair Competition"
cause of action, only federal statutes and regulations, including an unspecified provision of title
11 of the United States Code, 15 U.S.C. § 1125(a)(1)(A), and 48 C.F.R. § 19.502-2); it merely
makes a single allegation that Panasonic and RDC violated state antitrust laws in its statement of
facts, see id. ¶ 21 ("Since, at all times prior to Jan[uary] 1, 2014[,] RDC and Proxtronics were
direct competitors, Panasonic['s] act of making RDC an exclusive dealer and thus forcing
Proxtronics to have to purchase Panasonic products from . . . RDC represents unfair
[competition] and violates federal and state antitrust laws.").

[10]  The statute cited by plaintiff—41 U.S.C. § 253—last appeared in the United States
Code in 2011, when Congress recodified title 41.  See generally Pub. L. No. 111-350, 124 Stat.
3677 (2011).  The contents of former § 253(c) now appear in 41 U.S.C. § 3304.

6.302-2 concerning the use of other than full and open competition when there is unusual and compelling urgency. Id. ¶¶ 52-54, 56. In its prayer for relief, plaintiff seeks a declaratory judgment finding that the Air Force violated federal procurement laws, an award of compensatory damages in the amount of $2,000.000, and attorney's fees and costs. Id. at 14.

On March 13, 2016, plaintiff filed a motion to conduct jurisdictional discovery. The following day, defendant filed its motion to dismiss plaintiff's third amended complaint. Both motions are fully briefed, and the court deems oral argument unnecessary.

## II. LEGAL STANDARDS

Defendant moves to dismiss plaintiff's third amended complaint pursuant to RCFC 12(b)(1) and RCFC 12(b)(6). In ruling on a motion to dismiss under either rule, the court assumes that the undisputed allegations in the complaint are true and construes those allegations in the plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).

### A. RCFC 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion filed pursuant to RCFC 12(b)(1) challenges this court's subject matter jurisdiction. Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties, or the court sua sponte, may challenge the existence of subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006). The plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. Ultimately, if the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### B. RCFC 12(b)(6) Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief. See Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."). A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6) tests the sufficiency of the complaint. Bell Atl. Corp., 550

U.S. at 555-56; see also RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 481, 492 (2009) ("A motion made under Rule 12(b)(6) challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced."). The United States Supreme Court explained in Bell Atlantic Corp. the degree of specificity with which a plaintiff must plead facts sufficient to survive such a motion, stating that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (citation omitted).

Although a complaint need not contain "detailed factual allegations," the "factual allegations must be enough to raise a right to relief above the speculative level . . . ." Id.  In other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp., 550 U.S. at 556).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Bell Atl. Corp., 550 U.S. at 546. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).  However, the court must dismiss a complaint "when the allegations in a complaint, however true, could not raise a claim of entitlement of relief." Bell Atl. Corp., 550 U.S. at 558 (2007).

## III. DISCUSSION

### A. The Tucker Act's Bid Protest Jurisdiction

The Court of Federal Claims derives its bid protest jurisdiction from the Tucker Act.[11] See 28 U.S.C. § 1491(b).  For the purpose of ruling on defendant's motion to dismiss, § 1491(b)(1) provides that the court possesses

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to

---

[11]   Prior to 1982, the predecessor of the Court of Federal Claims exercised jurisdiction over preaward bid protests under the Tucker Act's waiver of sovereign immunity for claims based on implied contracts with the United States. Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1331 (Fed. Cir. 2001).  Relief was limited to money damages. Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1331.  The court's ability to grant declaratory and injunctive relief in preaward bid protests was added to the Tucker Act in section 133 of the Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, 39-40. Jurisdiction over postaward bid protests was added to the Tucker Act in section 12 of the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, 3874-76.

a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

This jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." Id. It is plaintiff's burden to establish the court's jurisdiction. Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013). When ruling in favor of a protestor, the court may "award any relief that [it] considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."[12]  28 U.S.C. § 1491(b)(2).

## B.  The Court Lacks Jurisdiction to Entertain Plaintiff's Claims Predicated on the Lanham Act and the Non-Tucker Act Provisions of Title 28 of the United States Code

As noted above, plaintiff contends that this court possesses jurisdiction to entertain its protest pursuant to 28 U.S.C. § 1491(b)(1); section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and federal question, diversity, and intellectual property statutes (28 U.S.C. §§ 1331, 1332(a)(1), 1338(a)-(b)). However, only one of these statutes—28 U.S.C. § 1491(b)(1)—provides for jurisdiction in the Court of Federal Claims.

The court first addresses plaintiff's Lanham Act claims. Although plaintiff concedes that the court lacks jurisdiction over its Lanham Act claims because they sound in tort, in its corrected opposition to defendant's motion to dismiss, it pivots to offer a new gloss on those claims: that they "are predicated on the contractual relationship between Plaintiff and the government and RDC/Panasonic and [the Air Force]." Opp'n 5-6. With this nuanced argument, plaintiff implies that this court may entertain Lanham Act-sounding claims so long as those claims are premised on breach of contract, not tort. In essence, plaintiff invites this court to make findings in this protest that demonstrate that the relationship between Panasonic and RDC is anticompetitive. Indeed, the unifying thread running throughout all four of the complaints filed by plaintiff in this matter is its objection to Panasonic's decision to make RDC an authorized dealer of Panasonic-brand products, thus giving RDC a competitive advantage over plaintiff. To the extent that plaintiff seeks such a ruling, it is in the wrong court.

It is an unremarkable proposition that the Court of Federal Claims lacks jurisdiction over Lanham Act claims. Congressional authorization to entertain claims arising under the Lanham Act extends only to district and territorial courts. See 15 U.S.C. § 1121(a) ("The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of

---

[12] The court therefore construes plaintiff's request for compensatory damages of $2,000,000, 3rd Am. Compl. 14, as a request for bid preparation and proposal costs. With respect to the 2014 procurement, plaintiff did not respond to the SSS or the NOI to award a sole-source contract, and therefore it is doubtful that it incurred bid preparation and proposal costs. Further, although plaintiff submitted a proposal during the 2015 procurement, it is highly unlikely that plaintiff incurred bid preparation and proposal costs of $2,000,000 for a proposal that contained an offer to supply the TLD badges to the Air Force for no more than $220,000.

the United States (other than the United States Court of Appeals for the Federal Circuit) shall have appellate jurisdiction, of all actions arising under [the Lanham Act.]"); Grayton v. United States, 92 Fed. Cl. 327, 332 & n.4 (2010) (holding that the Lanham Act does not "support[] jurisdiction in this court"). The Court of Federal Claims is not a district court. Ledford, 297 F.3d at 1382. Consequently, this court declines plaintiff's invitation to wade into Lanham Act waters. Accord Liberty Ammunition, Inc. v. United States, 101 Fed. Cl. 581, 591 (2011) (holding that it could not "exercise pendant jurisdiction over plaintiff's Lanham Act claim without contradicting congressional action" because (1) "violations of the Lanham Act sound in tort" and (2) "Congress has specifically assigned jurisdiction over Lanham Act claims to the district courts," such that "the Lanham Act's specific grant of jurisdiction to the district courts trumps the general jurisdictional grant to this court under 28 U.S.C. §§ 1491 and 1498").

Moreover, plaintiff's attempt to repackage its Lanham Act claims as bid protest claims is unavailing. Plaintiff requests that this court make anticompetitive findings against both Panasonic and RDC, but neither entity is a party to this litigation and plaintiff does not argue that joinder is permissible or appropriate. Indeed, it is well settled that the United States is the only proper defendant in the Court of Federal Claims. See 28 U.S.C. § 1491(a)(1) (providing that the Court of Federal Claims has jurisdiction over claims against the United States); RCFC 10(a) (requiring that the United States be designated as the defendant in the Court of Federal Claims); Nat'l City Bank of Evansville v. United States, 163 F. Supp. 846, 852 (Ct. Cl. 1958) ("It is well established that the jurisdiction of this court extends only to claims against the United States, and obviously a controversy between private parties could not be entertained." (footnote omitted)); Stephenson v. United States, 58 Fed. Cl. 186, 190 (2003) ("[T]he only proper defendant for any matter before this court is the United States, not its officers, nor any other individual."). Thus, the court must dismiss plaintiff's Lanham Act claims for lack of subject matter jurisdiction.

Similarly, plaintiff's invocation of specific statutes concerning federal question, diversity, and intellectual property—28 U.S.C. §§ 1331, 1332(a)(1), 1338(a)-(b)—to establish jurisdiction in this court is unavailing. All of the statutes relied upon by plaintiff fall within the exclusive province of the district courts. See 28 U.S.C. §§ 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."), 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[.]"), 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks."), 1338(b) ("The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws."). And, as noted above, the Court of Federal Claims is not a district court. See Ledford, 297 F.3d at 1382. Accordingly, the court lacks subject matter jurisdiction to entertain claims arising under these statutes. Accord Allbritton v. United States, 178 F.3d 1307, 1307 (Fed. Cir. 1998) (unpublished table decision) (noting that 28 U.S.C. §§ 1331 and 1332 "confer jurisdiction on district courts over certain claims but do not address the jurisdiction of the Court of Federal Claims"); Strougher v. United States, 89 Fed. Cl. 755, 762 (2009) (holding that the Court of Federal Claims is not authorized to exercise diversity jurisdiction); Faulkner v. United States, 43

Fed. Cl. 54, 55 (1999) ("The Court of Federal Claims does not have federal question jurisdiction under 28 U.S.C. § 1331."); cf. Lockridge v. United States, 218 Ct. Cl. 687, 690 n.2 (1978) ("Although 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121 give the district courts jurisdiction over actions relating to trademarks, those jurisdictional provisions do not waive the sovereign immunity of the United States.").

In sum, this court lacks subject matter jurisdiction over plaintiff's claims arising under the Lanham Act and 28 U.S.C. §§ 1331, 1332(a)(1), and 1338(a)-(b). Accordingly, all of plaintiff's claims based on those statutes must be dismissed.

The above-described jurisdictional deficiencies notwithstanding, plaintiff does invoke a statute that authorizes the Court of Federal Claims to exercise subject matter jurisdiction: 28 U.S.C. § 1491(b), the statute that empowers the court to entertain bid protests. Of course, invoking a statute within the jurisdictional province of this court is by itself insufficient to satisfy all jurisdictional requirements. Claims that survive dismissal because they are grounded on a statute endowing the court with jurisdiction are not automatically viable if a separate jurisdictional prerequisite or element is not met. In addition, even though a claim may survive a jurisdictional challenge, the claim is nevertheless subject to dismissal if questioned by a RCFC 12(b)(6) motion. With these guiding principles in mind, the court will address the legal issues implicated by plaintiff's challenges to the 2014 and 2015 procurements.

## C. Plaintiff's Protest of the 2014 Procurement Must Be Dismissed

With respect to the 2014 procurement, plaintiff contends that the Air Force improperly awarded the contract on a sole-source basis and violated several statutory and regulatory provisions governing a procuring agency's decision to conduct a sole-source procurement. Defendant moves to dismiss plaintiff's protest of the 2014 procurement on three grounds: standing, waiver, and mootness. Plaintiff's contrary arguments notwithstanding, each of the three individual bases defendant identifies for dismissal of plaintiff's complaint is meritorious. The three defects are addressed below seriatim.

### 1. Standing

Defendant first contends that plaintiff lacks standing to protest the 2014 procurement.

### a. Standard for Establishing Standing

As previously noted, the mere invocation of 28 U.S.C. § 1491(b)(1) does not establish this court's jurisdiction. Rather, "to come within the Court of Federal Claims's § 1491(b)(1) bid protest jurisdiction," a protestor must demonstrate that it is an interested party. Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). As explained by the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), "interested parties" for § 1491(b)(1) purposes are those "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n

of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (Supp. IV 1998)). This interested party requirement "imposes more stringent standing requirements than Article III." Weeks Marine, Inc., 575 F.2d at 1359.

To have standing as an interested party, a protestor must satisfy a two-part test. First, the protestor must demonstrate that it is an actual or prospective bidder. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also MCI Telecomm. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989) (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation"). Second, the protestor must demonstrate that it has a direct economic interest in the procurement. Rex Serv. Corp., 448 F.3d at 1307; Weeks Marine, Inc., 575 F.2d at 1359. In short, to qualify as an interested party, a protestor must demonstrate that it was prejudiced by the procuring agency's action.[13] Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (noting that "the question of prejudice goes directly to the question of standing"); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (remarking that "prejudice (or injury) is a necessary element of standing"); Textron, Inc. v. United States, 74 Fed. Cl. 277, 283 (2006) ("[A] successful protestor must also establish that the errors complained of caused prejudice.").

"When a party contends that the procurement procedure in a sole source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award."[14] Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001). More particularly, a

_____

[13] A protestor must also demonstrate prejudice to succeed on the merits. See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). The test for demonstrating prejudice at both the standing and merits stages of the protest is the same, but application of the test may yield different results due to the differing standards of review. See L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings).").

[14] The "substantial chance" standard is not applied in the preaward bid protest context. See Weeks Marine, Inc., 575 F.3d at 1361 ("[W]here a prospective bidder/offeror is challenging a solicitation in the pre-award context . . . , it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. The reason of course is that . . . there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a 'but for' prejudice analysis." (citation omitted)). Because plaintiff did

disappointed party can establish prejudice either by showing:  (1) proceeding
without the violation would have made the procurement official's decision to
make a sole-source award rather than to conduct a competitive bidding process
irrational, and in a competitive bidding process, the complaining party would
have a substantial chance of receiving the award; or (2) proceeding without the
violation, the complaining party would have a substantial chance of receiving the
sole-source award.

Id. (citations omitted).  Ultimately, in the sole-source procurement context, "[t]o have standing,
the plaintiff need only establish that it 'could compete for the contract' if the bid process were
made competitive."  Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (quoting Impresa
Construzioni Geom. Domenico Garufi, 238 F.3d at 1334); accord Savantage Fin. Servs., Inc. v.
United States, 81 Fed. Cl. 300, 306 (2008) ("Where a claim is made that the government
[committed a] violat[ion] . . . by refusing to engage in a competitive procurement, . . . it is
sufficient for standing purposes if the plaintiff shows that it likely would have competed for the
contract had the government publicly invited bids or requested proposals." (internal quotation
marks omitted)).  However, "[t]he mere fact that it might have submitted a bid in a competitive
procurement is not sufficient."  Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370.
Instead, "[a]lthough it need not show that it would have received the award in competition with
other hypothetical bidders, [the protestor] must show that it would have been a qualified bidder."
Id. at 1370-71.

### b. Plaintiff Cannot Establish Standing to Challenge the 2014 Procurement

The facts attendant to the 2014 procurement demonstrate that plaintiff does not qualify as
an actual or prospective offeror and therefore is not an interested party as contemplated by 28
U.S.C. § 1491(b)(1).  Briefly summarized, in January 2014, the Air Force was advised by
Panasonic that it would no longer sell its products directly to the Air Force.  Instead, if the Air
Force wished to purchase Panasonic-brand TLD products, it had to do so through Panasonic's
authorized dealer, RDC.  The foregoing written advice from Panasonic notwithstanding, on June
24, 2014, the Air Force, in performing due diligence, posted an SSS to the FedBizOpps website
seeking information from the business community to determine other sources for TLD badges.
The SSS specifically indicated that it was a market research tool, not a solicitation.  On August
15, 2014, the Air Force posted a revised SSS to the FedBizOpps website providing for a five-day
response period.  Only RDC, Panasonic's authorized dealer, responded to the SSS.  Based upon
the lone response from RDC, the contracting officer received formal approval of a J&A
recommending a sole-source award to RDC.  On September 12, 2014, the Air Force posted to the
FedBizOpps website an NOI to award a sole-source contract to RDC.  Because the Air Force did
not receive any responses to the NOI, on September 16, 2014, it sent a solicitation for Panasonic-
brand TLD badges to RDC.  RDC responded by sending a proposal to the Air Force that same

---

not challenge the 2014 and 2015 procurements in the Court of Federal Claims until after the Air
Force awarded the contracts, the court applies the "substantial chance" standard.

day.  On September 19, 2016, the Air Force awarded the contract to RDC and posted a synopsis of the award to the FedBizOpps website.

Court of Federal Claims case law indicates that to qualify as an actual or prospective offeror, a party that disagrees with a procuring agency's decision not to conduct a competitive procurement must so advise the agency, either by responding to one of the agency's notices concerning the procurement or by submitting a proposal.  For example, in Infrastructure Defense Technologies, LLC v. United States, the Defense Logistics Agency ("DLA") issued a request for proposal for a sole-source IDIQ contract for "collapsible force protection," i.e., defense walls, that had previously been manufactured and provided by Hesco Bastion, Ltd. ("Hesco").  81 Fed. Cl. 375, 377, 382 (2008).  The previously issued presolicitation notice "stated that Hesco held an internationally-recognized design patent on these items," but that "'[t]echnically acceptable proposals [would] be evaluated for price reasonableness and award [would] be made to the lowest priced technically acceptable offeror.'"  Id. at 380-81 (quoting the presolicitation notice).  The protestor ("IDT"), a manufacturer of corrugated metal bin revetment forms, "did not consider it was obtaining fair treatment under the existing [procurement] system."  Id. at 377, 381.  As a consequence, soon after the DLA issued the presoliciation notice, a representative of IDT met with the Deputy Undersecretary of Defense to "vigorously advocate for full competition for force protection barrier material."  Id. at 382.  Ultimately, the agency determined that "'[o]nly the offer received from Hesco [would] be considered for award.'"  Id. at 383 (quoting an addendum to a prenegotiation briefing memorandum).  The agency therefore published an NOI to award a sole-source contract to Hesco.  Id. at 392.  Throughout the procurement process, IDT failed to submit a bid or proposal, nor did it file a protest in response to the agency's notice to make a sole-source award.  Id. at 386.  In holding that IDT lacked standing, the court observed that "IDT was not prevented from submitting a proposal," id. at 385, and that its failure to do so precluded it from establishing standing to protest the award, id. at 387.

Two years later, in Shamrock Foods Co. v. United States, 92 Fed. Cl. 339 (2010), the Court of Federal Claims again confronted the issue of whether a nonoffering protestor could establish standing in a bid protest.  In Shamrock Foods Co., a postaward protest, the plaintiff ("Shamrock") was the incumbent contractor providing food and beverages at an Army fort.  Id. at 340-41.  At some point, the government found Shamrock's contract performance to be unsatisfactory, and therefore invoked the pertinent contract provision allowing it to find a replacement for Shamrock.  Id. at 342.  The government identified four vendors (including Shamrock) that could provide the needed back-up services at the fort, three of whom submitted proposals.  Id.  Shamrock contacted the contracting officer by letter to oppose its removal as the fort's food and beverage contractor.  Id. at 343.  But, Shamrock failed to submit a proposal for the work at the fort, even though it was contacted and informed of the opportunity to do so, and even though the deadline for submitting proposals was extended by two weeks at Shamrock's request.  Id. at 344. The court held that "[b]ecause Shamrock did not submit a bid for the . . . work at Fort Bliss, [it had] no standing for this post-award protest."  Id.

In this case, plaintiff did not respond to the original or revised SSS, did not respond to the NOI to award a sole-source contract, and did not submit a proposal.  Thus, plaintiff does not qualify as an actual or prospective offeror, and cannot be considered an interested party with

respect to the 2014 procurement.  In an effort to counter this inevitable conclusion, plaintiff notes that on October 10, 2014, it filed a protest of the Air Force's award to RDC with the SBA; that on November 3, 2014, it advised the FTC of Panasonic's and RDC's anticompetitive behavior; and that it sent copies of its letters to the SBA and FTC to two United States senators.  Plaintiff further states that "[f]or reasons unknown, the [Air Force], the SBA and the FTC did not bother to respond to [its] protest."  3rd Am. Compl. ¶ 31.  However, by its own admission, plaintiff did not lodge a protest with the Air Force, the GAO, or this court, the three available fora for protests.  See 31 U.S.C. § 3556 (2012) (indicating that the GAO does not have "exclusive jurisdiction over protests" and that interested parties may file bid protests with the procuring agency or the Court of Federal Claims).  Thus, plaintiff cannot demonstrate that the Air Force had notice of its objections.

In sum, plaintiff's inability to demonstrate that it satisfies the interested party test for standing with respect to the 2014 procurement precludes this court's exercise of jurisdiction with respect to the Air Force's sole-source contract award to RDC.

## 2. Plaintiff Waived Its Objections to the 2014 Procurement

Although plaintiff's failure to establish standing is fatal to its protest of the 2014 procurement, the court will address defendant's remaining two arguments.  First, defendant contends that plaintiff waived its right to protest the 2014 procurement by failing to respond to either the SSS or the NOI to award a sole-source contract, or to file a protest, before the Air Force awarded the contract.  The court agrees.  Indeed, it can reach no other conclusion under the facts of this case.

The Air Force posted the SSS on June 24, 2014, but plaintiff did not respond to it or file a protest.  Nor did plaintiff submit a response or file a protest when the Air Force posted the NOI to award a sole-source contract nearly three months later, on September 12, 2014.  Rather, plaintiff waited until December 30, 2015, to file a protest in this court—more than fifteen months after the contract was awarded on September 19, 2014, and more than four months after contract performance was completed on August 17, 2015.

The binding precedent of the Federal Circuit concerning the timely filing of bid protests directs the outcome in this case.  For example, in Blue & Gold Fleet, L.P. v. United States, a preaward protest, the Federal Circuit made plain that it would not allow untimely protests:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

492 F.3d 1308, 1313 (Fed. Cir. 2007).  The same principle applies in postaward protests.  See Bannum, Inc. v. United States, 779 F.3d 1376, 1380-81 (Fed. Cir. 2015).

Although <u>Blue & Gold Fleet</u> and <u>Bannum, Inc.</u> concerned competitive procurements, the principles articulated in those decisions are nevertheless applicable in this case.  The "waiver rule" in <u>Blue & Gold Fleet</u> "is grounded in the statutory imperative that in bid protests 'the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.'"  <u>Red River Commc'ns, Inc. v. United States</u>, 109 Fed. Cl. 497, 509 (2013) (quoting <u>Blue & Gold Fleet</u>, 492 F.3d at 1313) (emphasis omitted).  A waiver rule is appropriate because it "prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation."  <u>Blue & Gold Fleet</u>, 492 F.3d at 1314.  When a protestor has "full knowledge" of the procurement but chooses not to participate, "the danger of prejudice to the Government [i]s the same as if the protestor[] had been [a] disappointed offeror[]," namely, that "a protest would render moot the procurement efforts to date and potentially require expending more time and effort on a reprocurement."  <u>Red River Commc'ns, Inc.</u>, 109 Fed. Cl. at 509.  "[T]he waiver rule [allows] the Government an opportunity to address potential defects . . . at an early stage in the procurement process, thereby avoiding wasted procurement efforts."  <u>Id.</u> at 509-10.

In this case, there is no dispute that plaintiff did not respond to the SSS or the NOI to award a sole-source contract, or file a protest at the GAO or Court of Federal Claims, prior to the Air Force awarding the 2014 contract to RDC.  However, plaintiff argues that the letters that it sent to the SBA and the FTC constituted agency-level protests.  Plaintiff is mistaken.  An agency-level protest that preserves a protestor's right to challenge a procurement must be filed with the agency conducting the procurement.  <u>See</u> <u>DGR Assocs., Inc. v. United States</u>, 94 Fed. Cl. 189, 194 (2010) ("<u>Blue & Gold Fleet</u> does not require a protester . . . to file suit before the closing date . . . , provided that timely challenges first have been made at the agency or before the GAO.").  Plaintiff did not lodge a protest with the Air Force, and its letters to the SBA and FTC in which it challenged the 2014 procurement cannot be deemed to have been lodged with the Air Force.  Moreover, the fact that the Air Force learned of plaintiff's protest with the SBA as the result of a congressional inquiry is also insufficient to demonstrate the existence of an agency-level protest because such a protest must be filed directly with the agency conducting the procurement.  <u>See</u> <u>Bannum, Inc.</u>, 779 F.3d at 1380 (reasoning that "mere notice of dissatisfaction or objection is insufficient to preserve [the protestor's] defective . . . challenge" because regulations require a formal protest).  In addition, plaintiff's letter to Senator Warner is insufficient to preserve its challenge because letters to political representatives do not afford "the procuring agency an adequate opportunity to address potential errors . . . ."  <u>Red River Commc'ns</u>, 109 Fed. Cl. at 511.  By failing to protest the Air Force's decision to award a sole-source contract prior to the award of that contract, plaintiff waived its right to challenge that decision.  <u>Accord</u> <u>Weston Sols., Inc. v. United States</u>, 95 Fed. Cl. 311, 323 (2010) (finding that where a government agency issued a synopsis requesting information from qualified providers, because "the plaintiff failed to object to the terms of the synopsis" before the time to respond ended, the plaintiff "waived its ability to raise that objection" after the evaluation period concluded); <u>Scott v. United States</u>, 78 Fed. Cl. 151, 154 n.2 (2007) ("[A] protest challenging the terms of a government solicitation containing a patent error may never be waged post-award, because the opportunity to object to such an error ends upon the close of the bidding process and, necessarily, prior to any award being made.").

### 3.  Plaintiff's Claims Are Moot

Defendant also contends that the court cannot entertain plaintiff's protest of the 2014 procurement because the protest is moot.  As detailed above, plaintiff failed to protest the 2014 contract award to RDC until it filed its original complaint in this court on December 30, 2015. At the time plaintiff filed its protest, the 2014 contract had been fully performed.  Specifically, the Air Force issued a contract to RDC on September 19, 2014; pursuant to the terms of that contract, RDC tendered the Panasonic-brand TLD badges to the Air Force on July 7, 2015; and the Air Force paid RDC's invoice for the badges on August 17, 2015.  Thus, the date on which plaintiff filed its original protest in this court was four-and-one-half months after contract completion.  In other words, at the time plaintiff filed its complaint, there was no relief that the court could award.  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Powell v. McCormack, 395 U.S. 486, 496 (1969).  A court "will determine only actual matters in controversy essential to the decision of the particular case before it."  United States v. Alaska S.S. Co., 253 U.S. 113, 115 (1920). "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests."  Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937).

Plaintiff does not dispute that the contract has been completed, nor that it brought its protest after contract completion.  Given the timing of plaintiff's protest, there is no contract performance to enjoin.  Nor are there bid preparation and proposal costs to be awarded—plaintiff incurred none because it did not participate in the procurement.  See supra note 12.  Indeed, a protest filed after contract completion provides a textbook example of the necessity for, and underpinnings supporting, the mootness doctrine.  There is no remedy that could be fashioned to compensate plaintiff for any alleged injury.  In fact, in light of its failure to indicate during the 2014 procurement—either by responding to the SSS or the NOI to award a sole-source contract, or by filing a bid protest—that it could provide the TLD badges sought by the Air Force, plaintiff cannot demonstrate injury.

In short, plaintiff's ability to protest the 2014 procurement has long passed.  Accordingly, plaintiff's protest of that procurement is moot, and plaintiff is not entitled to any relief.  Accord Innovation Dev. Enters. of Am., Inc. v. United States, 108 Fed. Cl. 711, 724 (2013) (finding that the plaintiff's requests for injunctive relief were moot because the contract had been fully performed).

### D.  Plaintiff's Protest of the 2015 Procurement Must Be Dismissed

Having concluded that plaintiff cannot maintain its protest of the 2014 procurement, the court turns its attention to the 2015 procurement.  With respect to this procurement, plaintiff alleges that the Air Force failed to set aside the contract for a small business and failed to conduct a size determination.[15]  Defendant moves to dismiss plaintiff's protest of the 2015 procurement on standing and waiver grounds.

_____

[15]  Plaintiff also alleges that the Air Force violated several statutory and regulatory

**1.  Plaintiff Has Standing to Challenge the 2015 Procurement**

As an initial matter, plaintiff has standing to protest the 2015 contract award to RDC. Applying the interested party standard to the facts attendant to the 2015 procurement, the court finds that because plaintiff submitted a timely proposal to the Air Force, plaintiff was an actual offeror.  And, because plaintiff had a substantial chance of being awarded the contract (if, as the court must assume for the purposes of its standing analysis, plaintiff's allegations regarding the Air Force's failure to set aside the procurement for a small business and failure to conduct a size determination are accurate), plaintiff had a direct economic interest affected by the award of the contract.  Nevertheless, the court is unable to entertain plaintiff's protest because it waived its right to challenge the 2015 procurement.

**2.  Plaintiff Waived Its Objections to the 2015 Procurement**

The facts surrounding the 2015 procurement are not reasonably in dispute and are summarized as follows.  In 2015, in anticipation of its annual TLD badge procurement, the Air Force conducted initial market research to identify potential TLD badge manufacturers.  The market research results were unchanged from the 2014 acquisition—although Panasonic, Landauer, and Thermo Fisher Scientific were identified as potential sources, only Panasonic's products met all of the Air Force's requirements.  In addition, the Air Force identified RDC as the authorized distributor of Panasonic TLD badges and found RDC capable of meeting its requirements since it was awarded the 2014 contract.  The contracting officer took the additional step of contacting Panasonic to inquire as to whether RDC remained its only authorized dealer, and was advised by Panasonic that the Air Force's understanding was correct.  To further research the potential for competition, on July 20, 2015, the Air Force posted to the FedBizOpps website an SSN regarding its need to acquire 10,000 TLD badges for fiscal year 2015.

On July 31, 2015, plaintiff submitted its response to the SSN.  On August 7, 2015, the Air Force informed plaintiff that it could not be considered for the contract based upon Panasonic's advice that RDC was the only authorized reseller of Panasonic-brand TLD badges.  In response, plaintiff filed a GAO protest on August 12, 2015, leading the Air Force to investigate plaintiff's assertion that it could meet the Air Force's requirements.  On August 24, 2015, plaintiff provided the Air Force with documentation that the Air Force determined adequately demonstrated that plaintiff could meet the Air Force's requirements.  Thus, the Air Force decided to conduct a competitive procurement.  Based on the Air Force's decision to take corrective action, plaintiff withdrew its GAO protest on August 26, 2015.

---

provisions governing a procuring agency's decision to conduct a sole-source procurement.  See 3rd Am. Compl. ¶¶ 52-54 (alleging that the Air Force violated 10 U.S.C. § 2304(e), 41 U.S.C. § 253(c), and FAR 6.302-2).  However, the Air Force did not award the 2015 contract to RDC on a sole-source basis; the procurement was competitive.  Accordingly, plaintiff cannot state a claim upon which relief can be granted with respect to these statutory and regulatory provisions.

On September 2, 2015, the Air Force issued a competitive, brand-name solicitation for Panasonic-brand TLD badges.  The procurement was not set aside for a small business.  The Air Force received two timely proposals by the September 10, 2015 deadline, one from plaintiff and the other from RDC.  The Air Force concluded that both proposals were technically acceptable, that both plaintiff and RDC were small businesses, and that RDC offered the lowest price.  It therefore selected RDC for contract award and, on September 16, 2015, awarded the contract to RDC in the amount of $190,000.  On September 17, 2015, the Air Force posted the notice of award on the FedBizOpps website and informed plaintiff that it had not been awarded the contract.  Plaintiff requested a debriefing, which was provided on September 21, 2015.  On December 30, 2015, more than three months after contract award, plaintiff filed its complaint in this court.

As noted above, plaintiff alleges that the Air Force failed to set aside the contract for a small business and failed to conduct a size determination.  As explained in the FAR, "[t]he purpose of small business set-asides is to award certain acquisitions exclusively to small business concerns."  FAR 19.501(a) (2014).  Contracting officers are required to "review acquisitions to determine if they can be set aside for small business," and must "perform market research" before concluding that an acquisition should not be set aside for a small business.  FAR 19.501(c).  Necessarily, the decision to set aside an acquisition for a small business must be made prior to issuing the solicitation.  See also FAR 19.508 (containing the solicitation provisions and contract clauses required when a contracting officer determines that an acquisition should be set aside for a small business).  Moreover, contracting officers are required to "accept an offeror's representation in a specific bid or proposal that it is a small business unless (1) another offeror or interested party challenges the concern's small business representation or (2) the contracting officer has a reason to question the representation."  FAR 19.301-1(b).  If an offeror wants to challenge another offeror's small business representation, it must file a protest with the contracting officer "by the close of business of the 5th business day after . . . receipt of the special notification from the contracting officer that identifies the apparently successful offeror . . . ."  FAR 19.302(d)(1).

The Air Force's decision not to set aside the 2015 procurement for a small business is reflected on the face of the solicitation.  And, plaintiff did not challenge that decision—a term of the solicitation—prior to the deadline for submitting proposals.  Accordingly, pursuant to Blue & Gold Fleet, 492 F.3d at 1313, and Bannum, Inc., 779 F.3d at 1380-81, plaintiff waived its right to protest the decision in this court.  Furthermore, the fact that plaintiff did not timely challenge the Air Force's decision not to set aside the 2015 procurement for a small business also disposes of plaintiff's size determination claim because in the absence of a successful challenge by plaintiff, the competition was open to businesses of any size and, therefore, RDC would have been awarded the contract regardless of its status as a small business.  Accordingly, plaintiff's protest of the 2015 procurement also must be dismissed.[16]

---

[16]  The parties also argue the merits of the 2015 procurement.  Although defendant's arguments are persuasive based on the limited record before the court, the court need not reach the merits of plaintiff's protest because it lacks jurisdiction to entertain it.  Consequently, the

### E.  Plaintiff's Motion for Jurisdictional Discovery Lacks Merit

Finally, plaintiff seeks to conduct jurisdictional discovery.  Specifically, plaintiff seeks discovery "to develop facts to refute defendant's argument that this court lacks jurisdiction" and "to respond to defendant's factual assertions relevant to defendant's argument that plaintiff[] failed to state a claim."  Disc. Mot. 1.  Plaintiff's motion includes the following proposed discovery items directed to defendant:  seven interrogatories,[17] six requests for admissions, seven requests for production of documents, and a request to depose the contracting officer.  According to plaintiff:

> [D]ocument and deposition discovery will disclose evidence relevant to the disputed factual issues in both the 2014 and 2015 Solicitations, as well as will provide answers related to why the government allowed the unfair competition structure [with] Panasonic to remain in place, and whether this decision was based on the failure to evaluate whether suspected antitrust activities are occurring regarding the radiation supplies and services business.

Id. at 8.

With respect to the 2014 procurement, plaintiff contends that despite the results of the market research, the Air Force knew or should have known that plaintiff was a potential source for TLD badges.  Plaintiff further contends that the Air Force learned that plaintiff "filed a small business protest," but nevertheless failed to consider the "size standard and anti-trust violation issues" plaintiff raised.  Id. at 4.  Plaintiff asserts that discovery regarding these issues would aid it in establishing jurisdiction.

Plaintiff then asserts, with respect to the 2015 procurement, that discovery is necessary to determine whether the Air Force complied with the applicable regulations for a small business procurement, claiming that although the Air Force "made the . . . 2015 solicitation a small business set aside, with some size standard[, it] did not put the small business information into the solicitation."  Id. at 2.  Plaintiff argues that discovery is required to obtain the "small business

---

court's analysis on substantive issues would be mere dicta.

[17]  For example, in Interrogatory 1, plaintiff requests that defendant "[i]dentify and describe any and all transactions, business deals, loans or investments, or any other professional endeavors you are aware of or have observed between RDC and Panasonic . . . ."  Disc. Mot. 6. Plaintiff requests in Interrogatory 6 that defendant "[i]dentify any litigation, legal actions, or mediation where you and/or any corporation, LLC or business you contracted with have been named or are involved as a party from January 1, 2010 through the present in any Small Business set aside protest, and/or antitrust violations."  Id. at 7.  And, in Interrogatory 7, plaintiff directs defendant to provide the name of each expert it expects to call at trial.  Id.

size standard" for the procurement, and to obtain proof that RDC is a small business.[18]  Id. Plaintiff asserts that deposing the contracting officer is also necessary to explain "unfair competition issues raised by Proxtronics," and why the contracting officer did not report the "antitrust violation issues" to the United States Attorney General.  Id. at 5.  Further, plaintiff argues that jurisdictional discovery is required to determine whether the Air Force properly conducted market research "to identify small business concerns capable of performing the work" required by the contract.  Id.

In non-bid protest cases, a movant must explain with specificity why jurisdictional discovery is necessary, "explain [its] relevance," and "indicate the basis" for the belief that "there are contradictory facts."  Smith v. United States, 101 Fed. Cl. 474, 478 (2011) (internal quotation marks omitted), aff'd, 495 F. App'x 44 (Fed. Cir. 2012).  However, the standard for discovery in the bid protest context is narrower.  In bid protests, "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)).  A protestor must provide "concrete and specific reasons," not simply "nebulous assertions," as to why discovery is necessary.  DataMill, Inc. v. United States, 91 Fed. Cl. 722, 732 (2010).

Moreover, if a protestor alleges that discovery is necessary to obtain evidence of bad faith, its motion must assert "sufficient well-grounded allegations of bias to support supplementation."  Inforeliance Corp. v. United States, 118 Fed. Cl. 744, 748 (2014) (internal quotation marks omitted).  "[G]overnment officials are presumed to act in good faith," Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1288 (Fed. Cir. 2010), and this is a "strong presumption," AmPro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002).  Thus, when requesting discovery, "the plaintiff must persuade the Court that discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regularity and good faith."  Beta Analytics Int'l, Inc. v. United States, 61 Fed. Cl. 223, 226 (2004).  "In order to overcome the presumption of good faith . . . , the proof must be almost irrefragable.  Almost irrefragable proof amounts to clear and convincing evidence." Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citations and internal quotation marks omitted).  The "allegation of bias" must be "well-grounded," supported by "hard facts," Tech. Sys., Inc. v. United States, 97 Fed. Cl. 262, 265 (2011) (internal quotation marks omitted), and based on "a strong evidentiary footing," Orion Int'l Techs. v. United States,

---

[18]  Plaintiff claims that the 2015 procurement both was and was not set aside for a small business.  Compare 3rd Am. Compl. ¶ 37 (noting that the SSN indicated that the procurement had not, at that time, been set aside for a small business, and challenging the Air Force's "failure to set aside" the procurement for a small business), with Disc. Mot. 2 ("Importantly, after filing of the instant action, it was discovered that Defendant made the subject 2015 Solicitation a small business set aside, with some size standard.").  As reflected on the face of the solicitation, the 2015 procurement was not set aside for a small business.  Plaintiff fails to allege any facts, supply any evidence, or provide any explanation in support of its contrary contention.

60 Fed. Cl. 338, 344 (2004).  Innuendo, suspicion, conjecture, or counsel's argument are not sufficient.  Tech. Sys., Inc., 97 Fed. Cl. at 265; Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. 327, 332 (2010); Beta Analytics Int'l, Inc., 61 Fed. Cl. at 226; Orion Int'l Techs., 60 Fed. Cl. at 344.  In instances "where the court has considered allegations of bad faith, the necessary irrefragable proof has been equated with evidence of some specific intent to injure the plaintiff."  Galen Med. Assocs., 369 F.3d at 1330 (internal quotation marks omitted).

Plaintiff's discovery requests reflect plaintiff's profound misunderstanding of the conduct of bid protest litigation in this court.  Plaintiff provides no cogent reason to explain why discovery is justified to resolve any factual disputes.  Nor does plaintiff offer any evidence or "hard facts" lending credence to its claim that the Air Force engaged in wrongdoing, including that it specifically intended to injure plaintiff during the procurement.  Bald allegations will not suffice; evidence supporting a claim of bad faith is required.

More particularly, with respect to the 2014 procurement, plaintiff argues that despite the results of the market research, the Air Force should have considered plaintiff to be a potential source of TLD badges.  However, as defendant correctly points out, the purpose of the Air Force's initial market research was to identify TLD badge manufacturers.  Plaintiff is not a TLD badge manufacturer, but, rather, is a TLD badge distributor.  Further, by posting the SSS, the Air Force did, in fact, conduct market research to identify entities that sold TLD badges.  Plaintiff failed to respond to the SSS and thus was not included in that market research.  Because there is no dispute as to these facts, jurisdictional discovery regarding the Air Force's market research is unwarranted.  Moreover, there is no merit to plaintiff's argument that the Air Force failed to conduct market research to identify small businesses; the SSS clearly indicated that the Air Force was seeking responses from small businesses to determine whether the procurement should be set aside for one.

Further, jurisdictional discovery regarding the 2014 procurement would not cure the defects previously identified by the court.  Plaintiff failed to respond to the SSS or the NOI to award a sole-source contract, performance of the contract was completed on August 17, 2015, and plaintiff did not file its protest in this court until December 30, 2015, nearly four-and-one-half months after contact completion.  Because contract performance was completed before plaintiff challenged the procurement, there are no facts that plaintiff could obtain through discovery to cure the standing, waiver, and mootness defects.  Accordingly, jurisdictional discovery regarding the 2014 procurement is unnecessary.

Nor is plaintiff is entitled to discovery related to the 2015 procurement.  Plaintiff argues that the 2015 procurement was designated as a "small business set aside, with some size standard," and seeks discovery to establish that size.  Disc. Mot. 2.  Plaintiff is mistaken.  It is clear from the face of the solicitation that the procurement was not set aside for a small business.  Thus, there is no justification upon which plaintiff can legitimately claim a need for discovery to determine the size standard for the procurement.  Plaintiff is not entitled to concoct a more desirable set of facts to persuade the court that discovery is appropriate or that a motion to dismiss is unsupported.

Moreover, plaintiff's contention that discovery is necessary to ascertain whether RDC was a small business lacks merit.  Because the 2015 procurement was not set aside for a small business, it is irrelevant whether RDC is a small business.  Accordingly, jurisdictional discovery regarding whether RDC was a small business is unnecessary.

Additionally, as explained above, there can be no legitimate factual dispute that plaintiff failed to protest the 2015 procurement before the due date for proposals.  The contract was awarded on September 16, 2015, but plaintiff did not bring this protest until December 30, 2015, more than three months later, to complain that the 2015 procurement was required to be a small business set-aside and that the awardee, RDC, was not a small business.  The waiver doctrine precludes plaintiff's protest, and there are no facts that plaintiff could obtain through discovery that would alter this conclusion.

In short, plaintiff has not demonstrated that jurisdictional discovery is necessary in this case.  Accordingly, the court must deny plaintiff's discovery motion.

## IV.  CONCLUSION

Because plaintiff failed to respond to the SSS or the NOI to award a sole-source contract and thus did not participate in the 2014 procurement, it lacks standing to protest that procurement.  In the alternative, by protesting the 2014 procurement months after contract completion, plaintiff waived any right it might have had to protest the 2014 sole-source award to RDC.  For the same reason, plaintiff's protest of the 2014 procurement is moot.  Finally, because plaintiff protested the 2015 procurement after the deadline for submitting proposals, it waived its right to challenge that procurement.  Consequently, defendant's motion to dismiss plaintiff's third amended complaint is **GRANTED**.

Further, the facts underlying defendant's motion to dismiss are not reasonably in dispute.  Plaintiff's request for jurisdictional discovery appears to be based upon a profound misunderstanding of the facts surrounding the two procurements at issue.  In addition, plaintiff offers no substantive allegations—beyond mere insinuations or misstatements of fact—to suggest evidence of bad faith on the part of the Air Force that would warrant discovery.  And, discovery would not cure the standing, waiver, and mootness defects identified by the court.  Accordingly, because plaintiff fails to provide any legitimate basis for conducting jurisdictional discovery, its motion is **DENIED**.

For the foregoing reasons, plaintiff's protest is **DISMISSED**.  Costs to defendant.  The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

-29-



**Renerative Tissue**
**Solicitation Number: FA8601-14-R-0057**
Agency: Department of the Air Force
Office: Air Force Materiel Command
Location: AFLCMC/PZIO - WPAFB

---

**Notice Type:**
Sources Sought

**Posted Date:**
June 24, 2014

**Response Date:**
Jul 09, 2014 10:00 am Eastern

**Archiving Policy:**
Automatic, 15 days after response date

**Archive Date:**
July 24, 2014

**Original Set Aside:**
N/A

**Set Aside:**
N/A

**Classification Code:**
65 -- Medical, dental & veterinary equipment & supplies

**NAICS Code:**
334 -- Computer and Electronic Product Manufacturing/334517 -- Irradiation Apparatus Manufacturing

---

**Synopsis:**
Added: Jun 24, 2014 3:32 pm
Thermoluminescent Dosimeter (TLD) Badges
FA8601-14-R-0047
This is a Sources Sought Synopsis; there is no solicitation available. Requests for a solicitation will not receive a response. This Sources Sought Synopsis is published for market research purposes. This market research will be used to help determine if this may be a competitive acquisition, or if a set-aside for any small business program is appropriate (Small Business, 8(a), HUBZone, Service-Disabled Veteran Owned (SDVO), Economically Disadvantaged Women Owned (EDWO) small businesses). Please review this announcement, including all attachments, in their entirety. Request interested parties complete and return a Capabilities Statement that describes the comparable product and the ability to meet the "Requirements" described below to identify firms who possess the capability to provide Thermoluminescent Dosimeter (TLD) Badges. The Government is in no way obligated to do business with or to enter into any form of contract with any person, firm or other entity that receives or responds to this announcement.

The Operational Contracting Branch, Technology Support Acquisition Section (AFLCMC/PZIOAA) is seeking potential sources, including small business sources.

In addition to the information requested in the paragraph below entitled "Capabilities package" responding parties must also indicate their size status in relation to the applicable North American Industry Classification System (NAICS) code assigned to this effort, NAICS 334517 with a Size Standard of 500 employees. Include in your response all socio-economic categories for which you qualify (SB, SDB, 8(a), Veteran-Owned (VO), Women-Owned (WO), EDWOSB, and HUBZone). Please indicate if you are the manufacturer or provide the name and size of the manufacturer of the product(s) you will be supplying. Respondents are further requested to indicate their status as a foreign-owned/foreign-controlled firm and any contemplated use of foreign national employees on this effort. Please include information about the firm's standard warranty. In addition, recent sales history to commercial companies should be included to determine commerciality.

Requirements for Thermoluminescent Dosimeter (TLD) Badges:

1. Four phosphor element TLD
2. The first element is Li2B4O7: Cu and is shielded by 18 mg/cm2 of Mylar®
3. The second and third elements, Li2B4O7: Cu and CaSO4: Tm, respectively, are shielded by approximately 360 mg/cm2 plastic.
4. The fourth element is CaSO4: Tm and is shielded by approximately1,040 mg/cm2 of lead and plastic

5. The provided TLDs must have a form-factor that is compatible with, and capable of being read within a Panasonic UD-7900M Automatic TLD reader.
6. FOB Destination

All interested firms shall submit a response demonstrating their capabilities to provide the requested items to the primary point of contact listed below. Any information submitted by respondents to this sources sought synopsis is voluntary. This sources sought synopsis is not to be construed as a commitment by the Government, nor will the Government reimburse any costs associated with the submission of information in response to this notice. As stipulated in FAR 15.201, responses to this notice are not considered offers and cannot be accepted by the Government to form a binding contract. The decision to solicit for a contract shall be solely within the Government's discretion.

Capabilities package: All interested firms shall submit a capabilities package that explicitly demonstrates company capabilities-indicating examples of commercial sales-and product specifications related to this effort. Responses may be submitted electronically to the following e-mail address: blaine.greenwalt@us.af.mil in a Microsoft Word compatible format or mailed to AFLCMC/PZIOA POC: A1C Blaine M. Greenwalt, 1940 Allbrook Drive, Room 109, Wright-Patterson AFB, OH 45433-5309 to be received no later than 10:00 AM, Eastern Time, 9 July 2014. Direct all questions concerning this acquisition to A1C Blaine M. Greenwalt at blaine.greenwalt@us.af.mil

Respondents will not be individually notified of the results of any government assessments. The Government's assessment of the capability statements received will factor into whether any forthcoming solicitation will be conducted as a full and open competition or as a set-aside for small business, or any particular small business designation (e.g. SDVOSB, HUBZone, 8(a), EDWOSB, etc.).

Be advised that all correspondence sent via e-mail shall contain a subject line that reads "FA8601-14-R-0057 TLD Badges." If this subject line is not included, the e-mail may not get through e-mail filters at Wright-Patterson AFB. Filters are designed to delete emails without subject lines or with suspicious subject lines or contents. Attachments with files ending in.zip or .exe are not allowable and will be deleted. Ensure only .pdf, .doc, or .xls documents are attached to email.

---

**Sources Sought FA8601-14-R-0057 Regenerative Tissue**

**Type:** Other (Draft RFPs/RFIs, Responses to Questions, etc..)
**Posted Date:** June 24, 2014

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Scanned_Document.pdf (548.77 Kb)
**Description:** Sources Sought FA8601-14-R-0057 Regenerative Tissue

---

**Contracting Office Address:**
1940 ALLBROOK DRIVE
WRIGHT-PATTERSON AFB, Ohio 45433-5309
United States

**Place of Performance:**
Wright-Patterson AFB, OH, 45433
Wright-Patterson AFB, Ohio 45433
United States

**Primary Point of Contact.:**
Blaine M. Greenwalt,
Contracting Specialist
blaine.greenwalt@us.af.mil
Phone: 9375224582

**Secondary Point of Contact:**
Kelli R. Vaughn,
Contracting Specialist
kelli.vaughn@us.af.mil
Phone: 9375224575

---

**ALL FILES**

Sources Sought FA8601-14-R-0057 Regenerative Tissue 

Case 1:15-cv-01589-MMS   Document 32   Filed 09/30/16   Page 32 of 47

Jun 24, 2014
Scanned_Document.pdf

---

**Opportunity History**

- **Original Synopsis**
  Jun 24, 2014
  3:32 pm



**Panasonic TLD Badges or Equal**
**Solicitation Number: FA8601-15-R-0124**
Agency: Department of the Air Force
Office: Air Force Materiel Command
Location: AFLCMC/PZIO - WPAFB

**Notice Type:**
Award

**Original Posted Date:**
September 2, 2015

**Posted Date:**
September 17, 2015

**Response Date:**
- Eastern

**Original Response Date:**
Sep 10, 2015 12:00 pm Eastern

**Archiving Policy:**
Automatic, 15 days after award date

**Archive Date:**
October 1, 2015

**Original Set Aside:**
N/A

**Set Aside:**
N/A

**Classification Code:**
66 -- Instruments & laboratory equipment

**NAICS Code:**
334 -- Computer and Electronic Product Manufacturing/334519 -- Other Measuring and Controlling Device Manufacturing

**Contract Award Date:**
September 16, 2015

**Contract Award Number:**
FA8601-15-C-0104

**Contract Award Dollar Amount:**
$190,000

**Contractor Awarded Name:**
Radiation Detection Company

**Contractor Awarded DUNS:**
009196478

**Contractor Awarded Address:**
3527 Snead Georgetown, TX 78626-8214
Georgetown, Texas 78626
United States

**Synopsis:**
Added: Sep 02, 2015 8:48 am   Modified: Sep 02, 2015 12:06 pm   Track Changes

**The purpose of this amendment is to clarify that the Government requires 10,000 new Panasonic UD-802AT TLD Badges.**

**COMBINED SYNOPSIS/SOLICITATION**

-

-

This is a combined synopsis/solicitation ("synopsis" hereafter), which is expected to result in the award of a firm-fixed-price contract for commercial item (i.e 10,000 new Panasonic UD-802AT TLD Badges or equal items), as described under the requirements section of this synopsis/solicitation or accompanying requirements attachment.  This synopsis/solicitation is prepared in accordance with the format in the Federal Acquisition Regulation (FAR) Subpart 12.6, as supplemented with additional information included in this notice. This announcement constitutes the only synopsis/solicitation; proposals are being requested and a written solicitation will not be issued. An award, if any, will be made to the responsible Offeror who submits a proposal that:

1. Conforms to the requirements of the synopsis/solicitation.

2. That receives a rating of "Acceptable" on the Technical Capability evaluation factor.

3. That submits the proposal with the lowest total evaluated price (TEP), provided that the

    TEP is not unbalanced and is fair and reasonable.

Submittal of quotes in response to this synopsis/solicitation constitutes agreement by the Offeror of all terms & conditions contained herein, which will also be the terms & conditions of any resulting contract.  It is the Offerors responsibility to be familiar with the applicable clauses and provisions. Clauses and provisions in full text may be accessed via the Internet at website http://farsite.hill.af.mil.  The Government reserves the right to award without discussions or make no award at all depending upon the quality of proposals received and the price fair and reasonableness of proposals received.

The synopsis/solicitation number for this requirement is **FA8601-15-R-0124** and is hereby issued as a Request for Quotes (RFQ) using FAR Subpart 13, Simplified Acquisition Procedures.

**NAICS Code:**  334519  Level gauges, radiation-type, manufacturing

**Business Size Standard: 500** Employees

-

**Acceptable means of Submission:**  All submissions must be submitted electronically to the following email address-deshaun.dilworth@us.af.mil by 10 September 15 at 1200 P.M. EST.

Any correspondence sent via e-mail must contain the subject line "**FA8601-15-R-0124** " The entire proposal must be contained in a single e-mail, unless otherwise approved and that does not exceed 5 megabytes including attachments.  E-mails with compressed files will not be accepted.  Note that e-mail filters at Wright-Patterson Air Force Base are designed to filter e-mails without subject lines or with suspicious subject lines or contents (i.e., .exe or .zip files).  Therefore, if the specified subject line is not included, the e-mail may not get through the e-mail filters. Also be advised that .zip or .exe files are not allowable attachments and may be deleted by the email filters at Wright-Patterson.  If sending attachments with email, ensure only .pdf, .doc, .docx, .xls or .xlsx documents are sent.  The email filter may delete any other form of attachments.

This synopsis incorporates FAR provisions and clauses in effect through Federal Acquisition Circular (FAC) Fac 2005-83, effective 03 August15; Defense Federal Acquisition Regulation Supplement (DFARS) Publication Notice (DPN) 20150626, effective 26 June 15; and Air Force Federal Acquisition Regulation Supplement (AFFARS) Air Force Acquisition Circular (AFAC) 2015-0406, effective 6 April  2015.

**Delivery Schedule:**  12 months from award

**Delivery Destination: 711**th **HPW/OML**

2510 Fifth Street Bldg 840, Area B

WPAFB OH 45433-7913

**Delivery Type:** FOB Destination (As defined in FAR 2.101-Definitions, the seller or consignor is responsible for the cost of shipping and risk of loss.)

**Inspection and Acceptance:** Both inspection and acceptance will be by the Government at Destination.

**Requirements:** 711th HPW/OML requires a 10,000 new Panasonic UD-802AT TLD Badges with the characterisitcs listed below. Please note that the must be new Panasonic UD-802AT  TLD badges or TLD badges that are compatible with the Panasonic UD-7900M Automatic TLD reader.

1. Four phosphor element TLD; two elements of $Li_2B_4O_7$: Cu and two of $CaSO_4$: Tm.

2. The first element is $Li_2B_4O_7$: Cu and is shielded by 18 $mg/cm2$ of Mylar®.

3. The second and third elements, $Li_2B_4O_7$: Cu and $CaSO_4$: Tm, respectively, are shielded by approximately 360 $mg/cm2$ plastic.

4. The fourth element is $CaSO_4$: Tm and is shielded by approximately 1,040 $mg/cm2$ of lead and plastic

5. The provided TLDs must have a form-factor that is compatible with, and capable of being read within a Panasonic UD-7900M Automatic TLD reader, existing and currently in use.

The Government will award a contract resulting from this synopsis/solicitation to the responsible Offeror whose offer conforming to the synopsis/solicitation will be most advantageous to the Government, price and other factors considered. Technical Capability and Price will be used to evaluate all offers.

**The quotations may be in any format but MUST include:**

1. Proposing company's name, address, DUNS number and Cage Code

2. Point of contact's name, phone, and email

3. Quotation number & date

4. Timeframe that the quote is valid

5. Individual item price

6. Total price including shipping (Net 30), No Progress Payments

7. Shipping (FOB Destination)

8. Delivery Schedule

9. Completed copy of FAR 52.212-3 Alternate I (attached)

10. Completed copy of FAR 52.222-22 and FAR 52.222-25 (attached)

11. Complete DFARS 252.209-7992(attached)

**Important Notice to Contractors:** Quotations **MUST** also contain a complete description of items offered and any technical manuals or literature to clearly show that the items meet or exceed the requirements listed above.  The Contracting Officer will review quotations based on the factors listed in this synopsis/solicitation and the information furnished by the Offeror.  Before price is considered, the proposal must meet the technical specifications of this

synopsis/solicitation.

**Important Notice to Contractors:**  All prospective awardees are required to register at the System for Award Management (SAM) and to maintain active registration during the life of the contract.   SAM can be accessed at https://www.sam.gov.  Any award resulting from this synopsis/solicitation will include DFARS Clause 252.232-7003, Electronic Submission of Payment Requests.  Section 1008 of the National Defense Authorization Act of Fiscal Year 2001 requires any claims for payment (invoices) under DoD contract to be submitted in electronic form.  Wide area Workflow- Receipt and Acceptance (WAWF-RA) is the DoD system of choice for implementing this statutory requirement.  Use of the basic system is at no cost to the contractor.  Contractors must complete vendor training, which is also available at no cost at http://www.wawftraining.com.  Prior to submitting invoices in the production system, contractors must register for an account at http://wawf.eb.mil/.

**The following provisions are incorporated into this solicitation:**

**FAR 52.212-1**, Instructions to Offerors

**DFAR 252.203-7005**, Representation Relating to Compensation of Former DoD Officials

**DFAR 252.204-7011**, Alternative Line Item Structure

**FAR 52.209-2,** Prohibition on Contracting with Inverted Domestic Corporations-Representation

**DFAR 252.225-7000**, Buy American-Balance of Payments Program Certificate

**The following provisions are incorporated into this solicitation by full text:**

**FAR 52.212-3**, Representations and Certifications (Attached)

**FAR 52.222-22**, Previous Contracts and Compliance Reports(Attached)

**FAR 52.222-25**, Affirmative Action Compliance(Attached)

**FAR 52.252-1**, Solicitation Provisions Incorporated by Reference

This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. The Offeror is cautioned that the listed provisions may include blocks that must be completed by the Offeror and submitted with its quotation or offer. In lieu of submitting the full text of those provisions, the Offeror may identify the provision by paragraph identifier and provide the appropriate information with its quotation or offer. Also, the full text of a solicitation provision may be accessed electronically at this/these address: http://farsite.hill.af.mil/

(End of Provision)

**FAR 52.252-5**, Authorized Deviations in Provisions

(a) The use in this solicitation of any Federal Acquisition Regulation (48 CFR Chapter 1) provision with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the provision.

(End of Provision)

**252.203-7998,** Prohibition on Contracting with Entities that Require Certain Internal Confidentiality Agreements-Representation. (DEVIATION 2015-O0010**)**

Insert the following provision in all solicitations that will use funds made available by the Financial Services and General Government Appropriations Act, 2015 (Division E of the

Consolidated and Further Continuing Appropriations Act, 2015,Pub. L. 113-235), or any other Act, including solicitations for the acquisition of commercial items under FAR part 12.

PROHIBITION ON CONTRACTING WITH ENTITIES THAT REQUIRE CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS-REPRESENTATION (DEVIATION 2015-O0010)

(FEB 2015)

(a) In accordance with section 743 of Division E, Title VII, of the Consolidated and Further Continuing Resolution Appropriations Act, 2015 (Pub. L. 113-235), Government agencies

are not permitted to use funds appropriated (or otherwise made available) under that or any other Act for contracts with an entity that requires employees or subcontractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contactors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(b) The prohibition in paragraph (a) of this provision does not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

(c) *Representation.* By submission of its offer, the Offeror represents that it does not require employees or subcontractors of such entity seeking to report fraud, waste, or abuse to sign

or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contactors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(End of provision)

**The following clauses are incorporated into this solicitation by reference:**

**FAR 52.203-3,** Gratuities

**FAR 52.204-4**, Printed or Copied Double-Sided on Postconsumer Fiber Content

**FAR 52.204-7,** System for Award Management

**FAR 52.204-16,** Commercial and Government Entity Code Reporting

**FAR 52.204-17** Ownership or Control of Offeror

**FAR 52.204-18,** Commercial and Government Entity Code Maintenance

**FAR 52.211-6,** Brand Name or Equal

**FAR 52.212-4,** Contract Terms and Conditions

**FAR 52.229-3,** Federal, State, and Local Taxes

**FAR 52.232-39,** Unenforceability of Unauthorized Obligations

**FAR 52.232-40,** Providing Accelerated Payments to Small Business Subcontractors

**FAR 52.233-2,** Service of Protest

**FAR 52.242-13,** Bankruptcy

**FAR 52.247-34,** F.O.B. Destination

**DFARS 252.203-7000,** Requirements Relating to Compensation of Former DoD Officials

**DFARS 252.203-7999** Prohibition on Contracting with Entities that Require Certain Internal Confidentiality Agreements(DEVIATION)

**DFARS 252.204-7003-** Control of Government Personnel Work Product

DFARS 252.204-7008, Compliance with Safeguarding Covered Defense Information Controls

**DFARS 252.204-7012,** Safeguarding of Unclassified Controlled Technical Information

**DFARS 252.209-7004,** Subcontracting with Firms that are Owned or Controlled by the Government of a Country that is a State Sponsor of Terrorism

**DFARS 252.209-7992,** Representation by Corporations Regarding an Unpaid Delinquent Tax Liability or a Felony Conviction under any Federal Law.

**DFARS 252.211-7003,** Item Unique Identification and Valuation

**DFARS, 252.215-7007,** Notice of Intent to Resolicit

**DFARS, 252.215-7008,** Only one Offer

**DFARS 252.223-7008,** Prohibition of Hexavalent Chromium

**DFARS 252.225-7001,** Buy American Act and Balance of Payment Programs

**DFARS 252.225-7012,** Preference for Certain Domestic Commodities

**DFARS 252.225-7031,** Secondary Arab Boycott of Israel

**DFARS 252.225-7002**, Qualifying Country Sources as Subcontractors

**DFARS 252.232-7003**, Electronic Submission of Payment Requests and Receiving Reports

**DFARS 252.232-7006**, Wide Area Workflow Payment Instructions

**DFARS 252.232-7010**, Levies on Contract Payments

**DFARS 252.243-7001**, Pricing of Contract Modifications

**DFARS 252.243-7002**, Requests for Equitable Adjustment

**DFARS 252.244-7000**, Subcontracts for Commercial Items

**DFARS 252.247-7022**, Representation of Extent of Transportation by Sea

**DFARS 252.247-7023**, Transportation of Supplies by Sea

**The following clauses are incorporated into this solicitation by full text:**

**FAR 52.212-5**, Contract Terms and Conditions Required to Implement Statutes or Executive Orders- Commercial Items

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.222-50, Combating Trafficking in Persons (FEB 2009) (22 U.S.C. 7104(g)).

____ Alternate I (AUG 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(2) 52.233-3, Protest After Award (AUG 1996) (31 U.S.C. 3553).

(3) 52.233-4, Applicable Law for Breach of Contract Claim (OCT 2004) (Public Laws 108-77, 108-78 (19 U.S.C. 3805 note)).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the contracting officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

_x__ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 4704 and 10 U.S.C. 2402).

___ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (41 U.S.C. 3509).

___ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (Jun 2010) (Section 1553 of Pub L. 111-5) (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009).

 **x** (4) 52.204-10, Reporting Executive compensation and First-Tier Subcontract Awards (Jul 2013) (Pub. L. 109-282) (31 U.S.C. 6101 note).

___ (5) [Reserved]

___ (6) 52.204-14, Service Contract Reporting Requirements (Jan 2014) (Pub. L. 111-117, section 743 of Div. C).

___ (7) 52.204-15, Service Contract Reporting Requirements for Indefinite-Delivery Contracts (Jan 2014) (Pub. L. 111-117, section 743 of Div. C).

__x_ (8) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment (Aug 2013) (31 U.S.C. 6101 note).

___ (9) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (Jul 2013) (41 U.S.C. 2313).

__ x_ (10) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (May 2012) (section 738 of Division C of Public Law 112-74, section 740 of Division C of Pub. L. 111-117, section 743 of Division D of Pub. L. 111-8, and section 745 of Division D of Pub. L. 110-161).

___ (11) 52.219-3, Notice of HUBZone Set-Aside or Sole-Source Award (Nov 2011) (15 U.S.C. 657a).

__x_ (12) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (Jan 2011) (if the Offeror elects to waive the preference, it shall so indicate in its offer)(15 U.S.C. 657a).

___ (13) [Reserved]

___ (14) (i) 52.219-6, Notice of Total Small Business Aside (Nov 2011) (15 U.S.C. 644).

___ (ii) Alternate I (Nov 2011).

___ (iii) Alternate II (Nov 2011).

___ (15) (i) 52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).

___ (ii) Alternate I (Oct 1995) of 52.219-7.

___ (iii) Alternate II (Mar 2004) of 52.219-7.

__x_ (16) 52.219-8, Utilization of Small Business Concerns (May 2014) (15 U.S.C. 637(d)(2) and (3)).

___ (17) (i) 52.219-9, Small Business Subcontracting Plan (Jul 2013) (15 U.S.C. 637 (d)(4)).

___ (ii) Alternate I (Oct 2001) of 52.219-9.

___ (iii) Alternate II (Oct 2001) of 52.219-9.

___ (iv) Alternate III (July 2010) of 52.219-9.

___ (18) 52.219-13, Notice of Set-Aside of Orders (Nov 2011) (15 U.S.C. 644(r)).

__x_ (19) 52.219-14, Limitations on Subcontracting (Nov 2011) (15 U.S.C. 637(a)(14)).

___ (20) 52.219-16, Liquidated Damages-Subcontracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

___ (21) (i) 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (Oct 2008) (10 U.S.C. 2323) (if the Offeror elects to waive the adjustment, it shall so indicate in its offer).

___ (ii) Alternate I (June 2003) of 52.219-23.

___ (22) 52.219-25, Small Disadvantaged Business Participation Program-Disadvantaged Status and Reporting (Jul 2013) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

___ (23) 52.219-26, Small Disadvantaged Business Participation Program-Incentive Subcontracting (Oct 2000) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

___ (24) 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (Nov 2011) (15 U.S.C. 657f).

X   (25) 52.219-28, Post Award Small Business Program Rerepresentation (Jul 2013) (15 U.S.C. 632(a)(2)).

___ (26) 52.219-29, Notice of Set-Aside for Economically Disadvantaged Women-Owned Small Business (EDWOSB) Concerns (Jul 2013) (15 U.S.C. 637(m)).

___ (27) 52.219-30, Notice of Set-Aside for Women-Owned Small Business (WOSB) Concerns Eligible Under the WOSB Program (Jul 2013) (15 U.S.C. 637(m)).

X   (28) 52.222-3, Convict Labor (June 2003) (E.O. 11755).

X   (29) 52.222-19, Child Labor-Cooperation with Authorities and Remedies (Jan 2014) (E.O. 13126).

X   (30) 52.222-21, Prohibition of Segregated Facilities (Feb 1999).

X   (31) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

__x_ (32) 52.222-35, Equal Opportunity for Veteran (Jul 2014) (38 U.S.C. 4212).

_X_ (33) 52.222-36, Equal Opportunity for Workers with Disabilities (Jul 2014) (29 U.S.C. 793).

__X_ (34) 52.222-37, Employment Reports on Veterans (Jul 2014) (38 U.S.C. 4212).

__X_ (35) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496).

___ (36) 52.222-54, Employment Eligibility Verification (Aug 2013). (Executive Order 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

___ (37) (i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Items (May 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

___ (ii) Alternate I (May 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

___ (38) (i) 52.223-13, Acquisition of EPEAT® -Registered Imaging Equipment (Jun 2014) (E.O.s 13423 and 13514

___ (ii) Alternate I (Jun 2014) of 52.223-13.

___ (39) (i) 52.223-14, Acquisition of EPEAT® -Registered Television (Jun 2014) (E.O.s 13423 and 13514).

___ (ii) Alternate I (Jun 2014) of 52.223-14.

___ (40) 52.223-15, Energy Efficiency in Energy-Consuming Products (Dec 2007) (42 U.S.C. 8259b).

___ (41) (i) 52.223-16, Acquisition of EPEAT® -Registered Personal Computer Products (Jun 2014) (E.O.s 13423 and 13514).

___ (ii) Alternate I (Jun 2014) of 52.223-16.

**X**   (42) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging while Driving (Aug 2011).

___ (43) 52.225-1, Buy American--Supplies (May 2014) (41 U.S.C. chapter 83).

___ (44) (i) 52.225-3, Buy American--Free Trade Agreements--Israeli Trade Act (May 2014) (41 U.S.C. chapter 83, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, Pub. L. 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43).

___ (ii) Alternate I (May 2014) of 52.225-3.

___ (iii) Alternate II (May 2014) of 52.225-3.

___ (iv) Alternate III (May 2014) of 52.225-3.

___ (45) 52.225-5, Trade Agreements (Nov 2013) (19 U.S.C. 2501, *et seq.*, 19 U.S.C. 3301 note).

**X**   (46) 52.225-13, Restrictions on Certain Foreign Purchases (Jun 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

___ (47) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Jul 2013) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2303 Note).

___ (48) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

___ (49) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

___ (50) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 4505), 10 U.S.C. 2307(f)).

___ (51) 52.232-30, Installment Payments for Commercial Items (Oct 1995) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).

**X**   (52) 52.232-33, Payment by Electronic Funds Transfer- System for Award Management (Jul 2013) (31 U.S.C. 3332).

___ (53) 52.232-34, Payment by Electronic Funds Transfer-Other Than System for Award Management (Jul 2013) (31 U.S.C. 3332).

___ (54) 52.232-36, Payment by Third Party (May 2014) (31 U.S.C. 3332).

___ (55) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).

___ (56) (i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx 1241(b) and 10 U.S.C. 2631).

___ (ii) Alternate I (Apr 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or executive orders applicable to acquisitions of commercial items:

___ (1) 52.222-41, Service Contract Labor Standards (May 2014) (41 U.S.C. chapter 67.).

___ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (May 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

___ (3) 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards -- Price Adjustment (Multiple Year and Option Contracts) (May 2014) (29 U.S.C.206 and 41 U.S.C. chapter 67).

___ (4) 52.222-44, Fair Labor Standards Act and Service Contract Labor Standards -- Price Adjustment (May 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

___ (5) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment--Requirements (May 2014) (41 U.S.C. chapter 67).

___ (6) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services--Requirements (May 2014) (41 U.S.C. chapter 67).

___ (7) 52.222-17, Nondisplacement of Qualified Workers (May 2014) (E.O. 13495).

___ (8) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations. (May 2014) (42 U.S.C. 1792).

___ (9) 52.237-11, Accepting and Dispensing of $1 Coin (Sep 2008) (31 U.S.C. 5112(p)(1)).

(d) *Comptroller General Examination of Record* The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records -- Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)

(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c) and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause-

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (41 U.S.C. 3509).

(ii) 52.219-8, Utilization of Small Business Concerns (May 2014) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(iii) 52.222-17, Nondisplacement of Qualified Workers (May 2014) (E.O. 13495). Flow down required in accordance with paragraph (1) of FAR clause 52.222-17.

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(v) 52.222-35, Equal Opportunity for Veterans (Jul 2014) (38 U.S.C. 4212).

(vi) 52.222-36, Equal Opportunity for Workers with Disabilities (Jul 2014) (29 U.S.C. 793).

(vii) 52.222-17, Employment Reports on Veterans (Jul 2014) (38 U.S.C. 4212).

(viii) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(ix) 52.222-41, Service Contract Labor Standards (May 2014), (41 U.S.C. chapter 67).

(x) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

_____ Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(xi) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment--Requirements (May 2014) (41 U.S.C. chapter 67.)

(xii) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services--Requirements (May 2014) (41 U.S.C. chapter 67)

(xiii) 52.222-54, Employment Eligibility Verification (Aug 2013).

(xiv) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Jul 2013) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

(xv) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations. (May 2014) (42 U.S.C. 1792). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(xvi) 52.247-64, Preference for Privately-Owned U.S. Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of Clause)

**FAR 52.252-2**, Clauses Incorporated by Reference

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address: http://farsite.hill.af.mil/

(End of Clause)

**FAR 52.252-6**, Authorized Deviations in Clauses

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(End of Clause)

**The following AFFARS clauses are incorporated into this solicitation by full text:**

**AFFARS 5352.201-9101-** Ombudsman

(a) An ombudsman has been appointed to hear and facilitate the resolution of concerns from offerors, potential offerors, and others for this acquisition. When requested, the ombudsman will maintain strict confidentiality as to the source of the concern. The existence of the ombudsman does not affect the authority of the program manager, contracting officer, or source selection official. Further, the ombudsman does not participate in the evaluation of proposals, the source selection process, or the adjudication of protests or formal contract disputes. The ombudsman may refer the interested party to another official who can resolve the concern.

(b) Before consulting with an ombudsman, interested parties must first address their concerns, issues, disagreements, and/or recommendations to the contracting officer for resolution. Consulting an ombudsman does not alter or postpone the timelines for any other processes (e.g., agency level bid protests, GAO bid protests, requests for debriefings, employee-employer actions, contests of OMB Circular A-76 competition performance decisions).

(c) If resolution cannot be made by the contracting officer, the interested party may contact the ombudsman, [Insert names, addresses, telephone numbers, facsimile numbers, and e-mail addresses of Center/MAJCOM/DRU/HQ AFICA/AFISRA/SMC ombudsman/ombudsmen]. Concerns, issues, disagreements, and recommendations that cannot be resolved at the Center/MAJCOM/DRU/HQ AFICA/AFISRA/SMC ombudsman level, may be brought by the interested party for further consideration to the Air Force ombudsman, Associate Deputy Assistant Secretary (ADAS) (Contracting), SAF/AQC, 1060 Air Force Pentagon, Washington DC 20330-1060, phone number (571) 256-2395, facsimile number (571) 256-2431.

(d) The ombudsman has no authority to render a decision that binds the agency.

(e) Do not contact the ombudsman to request copies of the solicitation, verify offer due date, or clarify technical requirements. Such inquiries shall be directed to the Contracting Officer.

(End of clause)

**AFFARS 5352.223-9000-** Elimination of Use of Class I Ozone Depleting Substances (ODS)

(a) Contractors shall not:

(1) Provide any service or product with any specification, standard, drawing, or other document that requires the use of a Class I ODS in the test, operation, or maintenance of any system, subsystem, item, component, or process; or

(2) Provide any specification, standard, drawing, or other document that establishes a test, operation, or maintenance requirement that can only be met by use of a Class I ODS as part of this contract/order.

[Note: This prohibition does not apply to manufacturing.]

(b) For the purposes of Air Force policy, the following products that are pure (i.e., they meet the relevant product specification identified in AFI 32-7086) are Class I ODSs:

(1) Halons: 1011, 1202, 1211, 1301, and 2402;

(2) Chlorofluorocarbons (CFCs): CFC-11, CFC-12, CFC-13, CFC-111, CFC-112, CFC-113, CFC-114, CFC-115, CFC-211, CFC-212, CFC-213, CFC-214, CFC-215, CFC-216, and CFC-217, and the blends R-500, R-501, R-502, and R-503; and

(3) Carbon Tetrachloride, Methyl Chloroform, and Methyl Bromide.

[NOTE: Material that uses one or more of these Class I ODSs as minor constituents do not meet the Air Force definition of a Class I ODS.]

(End of clause)

Attachments:

1. FAR 52.212-3(b) Alt I

2. FAR 52.222-22 and FAR 52.222-25

3. DFARS 252.209-7992

Please direct all questions toDe'Shaun Dilworth at deshaun.dilworth@us.af.mil or 937-522-4581

---

**Package #1**
**Posted Date:** September 2, 2015

52.212-3_Alternate_I.pdf (15.71 Kb)
**Description:** Clause

FAR_52.222-22_&_52.222-25.pdf (31.88 Kb)
**Description:** Clause

252.209-7992.pdf (261.92 Kb)
**Description:** Clause

---

**Contracting Office Address:**
1940 ALLBROOK DRIVE
WRIGHT-PATTERSON AFB, Ohio 45433-5309
United States

**Place of Performance:**
711th HPW/OML
2510 Fifth Street Bldg 840, Area B
WPAFB OH 45433-7913

WPAFB, Ohio 45433
United States

**Primary Point of Contact.:**
De'Shaun Terrel Dilworth,
Contract Specialist
deshaun.dilworth@us.af.mil
Phone: 9375224581

---

**ALL FILES**

Package
Sep 02, 2015
  52.212-3_Alternate_I.pdf
  FAR_52.222-22_&_52.222-25.p
  252.209-7992.pdf

---

**Opportunity History**
- Original Synopsis
  *Combined Synopsis/Solicitation*
  Sep 02, 2015
  8:48 am

- Changed
  Sep 02, 2015
  12:09 pm
- Award
  Sep 17, 2015
  8:32 am